**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Nathan WALL (95–5007) and Donald
Wall (95–5008), Defendants–
Appellants.**

**Nos. 95–5007, 95–5008.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 2, 1995.

Decided Aug. 15, 1996.

Van S. Vincent, Asst. U.S. Atty. (argued and briefed), Office of U.S. Atty., Nashville, TN, for plaintiff-appellee.

Cecil D. Branstetter (briefed), Carrol Kilgore (argued and briefed), Branstetter, Kilgore, Stranch & Jennings, Nashville, TN, for defendant-appellant.

Before: BOGGS and SILER, Circuit Judges, and COFFMAN, District Judge.*

SILER, J., delivered the opinion of the court, in which COFFMAN, D.J., joined. BOGGS, J. (pp. 1454–85), delivered a separate opinion concurring in part and dissenting in part.

SILER, Circuit Judge.

Defendants Nathan and Donald Wall appeal the district court's denial of their motion to dismiss the information charging them with operating an illegal gambling business. They entered conditional pleas of guilty to a violation of 18 U.S.C. § 1955.[1] Defendants

aver constitutional and statutory construction issues in this appeal. First, they attack the constitutionality of § 1955. Next, they contend that two essential requirements for conviction under § 1955 were not met: five persons did not "conduct" a gambling operation, and no state offense was violated. Finally, defendant Donald Wall alleges that the district court misapplied the United States Sentencing Guidelines in enhancing his sentence. For reasons stated hereafter, we affirm the district court.

Defendants owned and operated Amusement, Inc., a business that leased video poker machines to various establishments in Nashville, Tennessee. In addition to defendants, Amusement, Inc. had seven employees: a president, a junior technician, two route men, an office secretary, a part-time bookkeeper, and a manual laborer. The video poker machines were of a type that displayed the number of accumulated "credits" that players won. These credits could be used for replays or, at the player's request, the lessee of the machine would disburse money for the credits. Amusement, Inc. would reimburse the lessee for any money distributed in this manner.

## I. The Constitutionality of 18 U.S.C. § 1955

■ Section 1955 of Title 18 of the United States Code criminalizes illegal gambling operations of a certain size. Defendants contend that § 1955 is void as a prohibited exercise of congressional power.

■ This century has seen the aggrandizement of power by the legislative branch of our government heretofore unknown. None-

* The Honorable Jennifer B. Coffman, United States District Judge for the Eastern and Western Districts of Kentucky, sitting by designation.

1. 18 U.S.C. § 1955 reads in pertinent part:
   (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both.
   (b) As used in this section—
      (1) "illegal gambling business" means a gambling business which—
         (i) is a violation of the law of a State or political subdivision in which it is conducted;
      (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
      (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
      (2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

theless, the power of Congress is by no means absolute: it may exercise only those powers enumerated in the Constitution. *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). Expressly delegated to Congress is the ability "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., art. I, § 8, cl. 3. The interpretation of this seemingly innocuous clause has a storied history in Supreme Court jurisprudence that is well-documented elsewhere.[2]

Action by Congress pursuant to the Commerce Clause must be examined by the courts to verify that the legislative body acted within its Constitutional authority. This court has examined and upheld the constitutionality of 18 U.S.C. § 1955. *United States v. Pack,* 16 F.3d 1222, No. 92–3872, 1994 WL 19945, at \*\*1–\*\*2 (6th Cir. Jan. 25, 1994) (per curiam); *United States v. Leon,* 534 F.2d 667, 673–74 (6th Cir.1976). Other circuits have similarly upheld § 1955 as an appropriate exercise of Congress's power. *See, e.g., United States v. Sacco,* 491 F.2d 995, 999–1001 (9th Cir.1974) (en banc). To this court's knowledge, no other court has found § 1955 to be constitutionally infirm.

Before April 1995, a discussion on the constitutional viability of § 1955 would have terminated at this point. This statute would

have been summarily upheld as a valid exercise of congressional power under the Commerce Clause. For the first time in over fifty years, however, the Supreme Court invalidated a federal statute because Congress had exceeded its authority under the Commerce Clause. *United States v. Lopez,* —— U.S. ——, ——, 115 S.Ct. 1624, 1634, 131 L.Ed.2d 626 (1995). Thus, this court must renew its examination of § 1955.

In *Lopez,* the Supreme Court invalidated the Gun–Free School Zones Act, 18 U.S.C. § 922(q).[3] Canvassing past Commerce Clause decisions, the Court identified three categories of activities that Congress may regulate under its commerce power: (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and (3) "those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce." *Lopez,* —— U.S. at —— – ——, 115 S.Ct. at 1629–30 (citation omitted). The Court concluded that § 922(q), classified in the third category, failed to substantially affect interstate commerce.

In *Lopez,* the Court distinguished § 922(q) from other regulatory statutes.[4] First, it

---

**2.** *See, e.g., United States v. Lopez,* —— U.S. ——, —— – ——, 115 S.Ct. 1624, 1626–29, 131 L.Ed.2d 626 (1995) (outlining Commerce Clause jurisprudence); 1 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law, Substance and Procedure §§ 4.1–4.10 (2d ed.1992); Laurence H. Tribe, American Constitutional Law §§ 5–4 to 5–8 (2d ed.1988); John S. Baker, Jr. *Nationalizing Criminal Law: Does Organized Crime Make It Necessary or Proper?,* 16 Rutgers L.J. 495, 518–531 (1985) (tracing the interaction of Commerce Clause decisions and federal criminal law); Debra L. Farmer, Recent Development, *United States v. Lopez: The Fifth Circuit Declares the Gun–Free School Zone Act of 1990 an Unconstitutional Extension of Congressional Power Under the Commerce Clause,* 68 Tul. L. Rev. 1674, 1674–82 (1994); David S. Gehrig, Note, *The Gun–Free School Zones Act: The Shootout over Legislative Findings, The Commerce Clause, and Federalism,* 22 Hastings Const. L.Q. 179, 183–91 (1994).

**3.** The act made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18

U.S.C. § 922(q)(2)(A). The act did not require that the possession be related to interstate commerce.

**4.** The Court confirmed that mining coal, *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); extorting a loan, *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); running a restaurant or hotel, *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); *Heart of Atlanta Motel, Inc., v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); and growing wheat, *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942)—though each was an intrastate activity—were commercial activities validly regulated by Congress. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1630 ("Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained."); *see also id.* at ——, 115 S.Ct. at 1637 (Kennedy, J., concurring) ("These and like authorities are within the fair ambit of the Court's practical conception of commercial regulation and are not called in question by our decision today.").

emphasized the non-commercial nature of the statute:

> Section 922(q) is a criminal statute that by its terms has nothing to do with "commerce" or any sort of economic enterprise, however broadly one might define those terms. Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.

*Lopez,* —— U.S. at ——–——, 115 S.Ct. at 1630–31 (footnote omitted). On its face, § 922(q) did not regulate commercial activity; it did not regulate commercial actors. The statute was therefore non-commercial.

The second distinction hailed by the Court was that § 922(q) "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631. The Court emphasized that "[n]either the statute nor its legislative history contain[s] express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone." *Id.* at ——, 115 S.Ct. at 1631 (quotation omitted).[5] In

sum, "unlike the earlier cases to come before the Court here neither the actors nor their conduct have a commercial character, and neither the purposes nor the design of the statute have an evident commercial nexus." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1640 (Kennedy, J., concurring).

Significantly, the Court rejected two arguments that would justify the lack of congressional findings. First, § 922(q) represented a "sharp break" with prior firearm regulation. The "importation of previous findings ... [would therefore be] especially inappropriate." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1632. Second, and more important, the Court was unwilling to construct a tenuous argument that possession of a firearm in a school zone results in violent crime, which affects interstate commerce through increasing insurance costs and decreasing educational opportunities. *Id.* at ——, 115 S.Ct. at 1632.[6] Were this argument successful, the Court reasoned, "it is difficult to perceive any limitation on. federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign." *Id.* at ——, 115 S.Ct. at 1632.

The potential reach of *Lopez* has been debated.[7] The Supreme Court itself conceded that *Lopez* would result in legal uncertainty. *Id.* at ——–——, 115 S.Ct. at 1633–34 ("These [determinations of whether an

---

5. The Court was not requiring Congress to make formal findings as to the burdens on interstate commerce before enacting regulations; "[b]ut to the extent that congressional findings would enable us to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye, they are lacking here." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1632.

6. This argument was the focal point of Justice Breyer's dissent. *Lopez,* —— U.S. at ——–——, 115 S.Ct. at 1659–62 (Breyer, J., dissenting).

7. The dissent echoes post-*Lopez* calls for stricter judicial scrutiny of Congressional Commerce power. *See, e.g., United States v. Bishop,* 66 F.3d 569, 603 (3d Cir.1995) (Becker, J., dissenting) (calling *Lopez* a "watershed" case that "shifted the boundaries" of the Commerce Clause and threw into doubt the constitutionality of non-commercial intrastate crimes), *cert. denied,* —— U.S. ——, 116 S.Ct. 681, 133 L.Ed.2d 529 (1995) *and* —— U.S. ——, 116 S.Ct. 750, 133 L.Ed.2d

698 (1996); *cf. United States v. Chesney,* 86 F.3d 564, 581 n. 11 (6th Cir.1996) (Batchelder, J., concurring) (*"Lopez* presages a return to the day when the Congress's interstate commerce authority had meaningful limits."); *United States v. Wilson,* 73 F.3d 675, 691 (7th Cir.1995) (Coffey, J., dissenting) (describing *Lopez* as a "landmark case"). As stated in the dissent, academics have also debated the potential changes in post-*Lopez* Commerce Clause jurisprudence. *See, e.g.,* Richard A. Epstein, *Constitutional Faith and the Commerce Clause,* 71 Notre Dame L. Rev. 167, 167 (1996) (*"Lopez* may turn out to be a flash in the pan, or it may usher in a new age of constitutional restraint.") (footnote omitted); *cf.* Lino A. Graglia, *United States v. Lopez: Judicial Review Under the Commerce Clause,* 74 Tex. L. Rev. 719, 767 (1996) (predicting that "[i]t is most unlikely ... that the Court will be able to muster five votes to invalidate a commerce power measure when Congress does not commit the oversight that explains *Lopez* ").

activity is commercial] are not precise formulations, and in the nature of things they cannot be."). Criminal defendants across the country have exploited this uncertainty, citing *Lopez* in hopes that the statutes underlying their convictions will similarly be invalidated. Most courts have resisted urgings to extend *Lopez* beyond § 922(q). *See, e.g., United States v. Chesney,* 86 F.3d 564 (6th Cir.1996) (upholding 18 U.S.C. § 922(g), which prohibits the possession of a firearm by a felon); *United States v. Turner,* 77 F.3d 887 (6th Cir.1996) (same); *United States v. Michael R.,* 90 F.3d 340 (9th Cir.1996) (upholding 18 U.S.C. § 922(x)(2), which prohibits juvenile possession of a handgun); *United States v. Staples,* 85 F.3d 461 (9th Cir.1996) (upholding 18 U.S.C. § 924(c)(1), which prohibits the use of a firearm while engaged in drug trafficking); *United States v. Folen,* 84 F.3d 1103 (8th Cir.1996) (upholding 18 U.S.C. § 842(i), which prohibits felons from possessing explosives); *United States v. Lomayaoma,* 86 F.3d 142 (9th Cir.1996) (upholding the Indian Major Crimes Act, 18 U.S.C. § 1153); *United States v. Wilson,* 73 F.3d 675 (7th Cir.1995) (upholding the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248(a)(1)); *United States v. Sherlin,* 67 F.3d 1208 (6th Cir.1995) (upholding federal arson statute, 18 U.S.C. § 844(i)), *cert. denied,* — U.S. —, 116 S.Ct. 795, 133 L.Ed.2d 744 (1996) *and* — U.S. —, 116 S.Ct. 1548, 134 L.Ed.2d 650 (1996); *United States v. Bolton,* 68 F.3d 396 (10th Cir.1995) (upholding the Hobbs Act, 18 U.S.C. § 1951), *cert. denied,* — U.S. —, 116 S.Ct. 966, 133 L.Ed.2d 887 (1996); *United States v. Leshuk,* 65 F.3d 1105 (4th Cir.1995) (upholding 21 U.S.C. § 841(a)(1), which prohibits the manufacture of marijuana); *United States v. Bishop,* 66 F.3d 569 (3d Cir.1995) (upholding carjacking statute, 18 U.S.C. § 2119), *cert. denied,* — U.S. —, 116 S.Ct. 681, 133 L.Ed.2d 529 (1995) *and* — U.S. —, 116 S.Ct. 750, 133 L.Ed.2d 698 (1996); *United States v. Wilks,* 58 F.3d 1518 (10th Cir.1995) (upholding statute that prohibited the possession or transfer of machineguns, 18 U.S.C. § 922(o)); *cf. Pic–A–State Pa., Inc. v. Reno,* 76 F.3d 1294 (3d Cir.) (upholding Interstate Wagering Amendment, 18 U.S.C. § 1301, which prohibits the transmission in interstate commerce of information to be used for the purpose of procuring a lottery ticket), *cert. denied,* — U.S. —, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996); *Doe v. Doe,* 929 F.Supp. 608 (D.Conn.1996) (upholding the Violence Against Women Act of 1994, 42 U.S.C. § 13981). Few courts have cited *Lopez* to reverse a conviction. *See, e.g., United States v. Pappadopoulos,* 64 F.3d 522, 527 (9th Cir.1995) (holding that receipt of natural gas from out-of-state source was insufficient to confer federal jurisdiction for arson conviction);[8] *United States v. Mussari,* 894 F.Supp. 1360, 1363–64 (D.Ariz.1995) (holding that the Child Support Recovery Act, 18 U.S.C. § 228, which punished the failure to pay child support, was an unconstitutional

---

8. *Pappadopoulos* is sufficiently different from *Lopez* in that the statute in question expressly required an interstate nexus between the crime (arson) and the property. The court dismissed the argument that the mere receipt of out-of-state natural gas was enough to affect interstate commerce. The court did not invalidate the statute; it held that the prosecution did not prove the requisite jurisdictional element. *Pappadopoulos,* 64 F.3d at 528 ("Where the sole source of the interstate commerce connection is the receipt by a private home of natural gas from a company that receives some of that gas from an out-of-state source, federal jurisdictional requirements have not been met."); *see also United States v. Denalli,* 73 F.3d 328, 329 (11th Cir.1996) (following *Pappadopoulos* and holding that the arson of a residence does not satisfy the jurisdictional prerequisite of the federal arson statute); *cf. United States v. Pinckney,* 85 F.3d 4, 8 (2d Cir. 1996) (overturning conviction pursuant to "chop-shop" statute, 18 U.S.C. § 2322, because the government failed to prove the jurisdictional element of the offense). *But see United States v. Gomez,* 87 F.3d 1093, 1095–96 (9th Cir.1996) (setting fire to a six-unit apartment building meets jurisdictional element); *United States v. DiSanto,* 86 F.3d 1238, 1244–46 (1st Cir.1996) (torching of a restaurant fulfilled the jurisdictional element); *Sherlin,* 67 F.3d at 1213–14 (burning of college dormitory sufficient to trigger interstate commerce element); *United States v. Martin,* 63 F.3d 1422, 1427–28 (7th Cir.1995) (finding that building that had not been rented for three months still had sufficient relationship to interstate commerce activity to satisfy federal arson statute); *United States v. Moore,* 25 F.3d 1042, Nos. 93–5273, 93–5274, 93–5281, 1994 WL 251174, at **3 (4th Cir. June 10, 1994) (per curiam) ("[W]e h[o]ld that connection of a house to an interstate power grid constitutes a sufficient use in an activity that affects commerce to satisfy the arson statute."), *cert. denied,* — U.S. —, 115 S.Ct. 1838, 131 L.Ed.2d 756 (1995).

exercise of congressional power);[9] *cf. Hoffman v. Hunt*, 923 F.Supp. 791, 807 (W.D.N.C.1996) (declaring that 18 U.S.C. § 248, the Freedom of Access to Clinic Entrances Act, was an invalid expression of Congressional power);[10] *United States v. Olin Corp.*, 927 F.Supp. 1502, 1522–32 (S.D.Ala.1996) (holding that *Lopez* prohibits the application of CERCLA liability).[11]

The question thus becomes if and how *Lopez* will apply to 18 U.S.C. § 1955. This court will apply the *Lopez* framework to organize this discussion. Like § 922(q), § 1955 must be classified under the third category. Thus, to be sustained, § 1955 must regulate activities that substantially affect interstate commerce. To make this determination, this court will conduct a *Lopez* analysis: Is § 1955 commercial in nature? Is the statute otherwise connected to interstate commerce?

First, this court must determine whether § 1955 is commercially related—whether the statute regulates part of an economic enterprise. *Lopez*, —— U.S. at ——, 115 S.Ct. at 1631. On one hand, § 1955 resembles § 922(q). Both are criminal statutes of general application. Ostensibly, the purpose of both statutes is not to regulate commercial intercourse; rather, Congress's primary in-

tent was to deter and punish criminal behavior. *See, e.g., Mussari*, 894 F.Supp. at 1363–64 (interpreting statute that punished nonpayment of child support as criminal in nature rather than commercial).

On the other hand, § 1955 has a stronger link to commerce than does § 922(q). On its face, the statute has a commercial aspect. It does not prohibit gambling per se; rather, it punishes those who "conduct[ ] . . . an illegal gambling *business*." 18 U.S.C. § 1955(a) (emphasis added). To sustain a conviction, Congress required federal prosecutors to demonstrate that a certain amount of commercial activity took place—the business had to "remain[ ] in substantially continuous operation for a period in excess of thirty days or ha[ve] a gross revenue of $2,000 in any single day." *Id.* § 1955(b)(1)(iii). Gambling itself, in its multiple forms, is a commercial activity. *See, e.g., Pic–A–State Pa.*, 76 F.3d at 1301 (affirming that lottery tickets are "subjects of commerce" and that it was "beyond dispute that state lotteries affect interstate commerce"). By its terms, § 1955 is commercial in nature and is not favorably compared to possession of a gun in a school zone, which clearly does not involve commercial activity.[12]

9. *See also United States v. Parker*, 911 F.Supp. 830, 834 (E.D.Pa.1995) ("[I]t is plain to this court that Congress had no rational basis to conclude that the willful failure to pay a child support obligation substantially affects commerce. . . ."); *United States v. Bailey*, 902 F.Supp. 727, 729 (W.D.Tex.1995) (following *Mussari*). *But see United States v. Nichols*, 928 F.Supp. 302, 313 (S.D.N.Y.1996) (finding that the statute regulates the use of the channels of interstate commerce); *United States v. Kegel*, 916 F.Supp. 1233, 1237 (M.D.Fla.1996) (same); *United States v. Collins*, 921 F.Supp. 1028, 1036 (W.D.N.Y.1996) (finding a "rational, nontenuous relationship between interstate nonpayment of child support and interstate commerce"); *United States v. Hampshire*, 892 F.Supp. 1327, 1330 (D.Kan.1995) (same); *United States v. Sage*, 906 F.Supp. 84, 91 (D.Conn.1995) (same) *aff'd*, 92 F.3d 101 (2d Cir.1996); *United States v. Hopper*, 899 F.Supp. 389, 391–93 (S.D.Ind.1995) (collecting child support orders across state lines is commercial).

10. *But see United States v. Dinwiddie*, 76 F.3d 913 (8th Cir.1996); *United States v. Wilson*, 73 F.3d 675 (7th Cir.1995); *Cheffer v. Reno*, 55 F.3d 1517 (11th Cir.1995). The Freedom of Access to Clinic Entrances Act, like § 922(q) and § 1955, had no jurisdictional element. However, 18

U.S.C. § 248 is unlike § 1955 in that the statute targeted protest activity—non-commercial activity—rather than the abortion clinic itself, which is a commercial enterprise. *See Hoffman*, 923 F.Supp. at 809 ("[The Act] is not aimed at the commercial activity of abortion clinics. It is aimed at the basic freedom of individuals to engage in civil protest."). Section 1955, on the other hand, targets the commercial enterprise directly.

11. The district court in *Olin* broadly employed *Lopez* to strike the CERCLA statute as it applied to the defendants because "nothing in the [CERCLA] statute provide[d]" for a "case-by-case inquiry" to ensure an interstate commerce nexus. 927 F.Supp. at 1533. The Alabama court interpreted *Lopez* to require specific Congressional findings that a particular statute substantially affects interstate commerce—perhaps even requiring a jurisdictional clause in the statute itself—to withstand judicial scrutiny. This court does not find such an interpretation of *Lopez* persuasive.

12. The commercial aspect of a statute is one way in which courts have distinguished *Lopez*. *See, e.g., Staples*, 85 F.3d at 463 ("Unlike education,

Next, this court must analyze the purpose and design of § 1955 to determine whether it affects interstate commerce. Like § 922(q), § 1955 "contains no jurisdictional element which would ensure, through case-by-case inquiry," that the gambling operation in question affects interstate commerce. *Lopez*, —— U.S. at ——, 115 S.Ct. at 1631.[13] The prosecutor need not prove and the jury need not find that the accused or his instrumentalities crossed any state lines or affected interstate commerce. There is nothing in the statute that "might limit its reach to a discrete set of [gambling operations] that additionally have an explicit connection with or effect on interstate commerce." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1631. *But cf. Wilson*, 73 F.3d at 693–94 (Coffey, J., dissenting) (noting that jurisdictional requirement has diminished importance for the regulation of a business that engages in some form of economic activity).

Unlike § 922(q), however, § 1955 contains reams of legislative historical information to guide the courts. Enacting the Organized Crime Control Act of 1970, "Congress passed [§ 1955] in an attempt to attack sophisticated, large-scale illegal gambling operations which Congress thought to be a major source of income for organized crime." *United States v. King*, 834 F.2d 109, 112 (6th Cir.1987), *cert. denied*, 485 U.S. 1022, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988); *see* H.R.Rep. No. 91–1549, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007, 4028–32; *cf. Wilson*, 73 F.3d at 684 (noting the importance of Congressional findings connecting the criminal act to interstate commerce). Congress determined that "organized crime posed a major threat to American society and that illegal gambling operations provided organized crime with its greatest source of revenue." *United States v. Sacco*, 491 F.2d 995, 999 (9th Cir.1974) (en banc). Congress specifically found that "illegal gambling involves widespread use of, and has an effect upon, interstate commerce and the facilities of interstate commerce." H.R.Rep. No. 91–1549, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007, 4028; *see* S.Rep. No. 91–617, 91st Cong., 1st Sess. 70–76 (1969); *Sacco*, 491 F.2d at 999–1001 (outlining the debates and findings of Congress connecting illegal gambling to interstate commerce).[14]

drug trafficking is a commercial activity which substantially affects interstate commerce."); *Bishop*, 66 F.3d at 581 ("[C]arjacking is economic in a way that possession of a handgun in a school zone is not."); *Wilson*, 73 F.3d at 683 ("We agree ... that the [Freedom of Access to Clinic ·Entrances Act], unlike the Gun–Free School Zones Act, regulates a commercial activity—the provision of reproductive health services."); *cf. Gomez*, 87 F.3d at 1096 (upholding arson conviction because a "rental property is a commercial establishment, and is not substantially different than any other business"); *United States v. Kirk*, 70 F.3d 791, 802 (5th Cir.1995) (Jones, J., dissenting) (arguing that 18 U.S.C. § 922(o), which prohibits the possession of machineguns, should be invalidated because it "is a purely criminal law, without any nexus to commercial activity"), *reh'g en banc granted*, 78 F.3d 160 (5th Cir.1996); *Hoffman*, 923 F.Supp. at 813 ("[T]his court believes that Congress cannot regulate the protest activities of the Plaintiffs because those activities, like the gun possession at issue in *Lopez*, are simply not properly characterized as commercial or economic activities."). Even the dissents in *Bishop* and *Wilson* might uphold § 1955 because it clearly regulates economic activity. *See* 66 F.3d at 592 (Becker, J., dissenting) (highlighting that carjacking does not involve a "voluntary economic exchange"); 73 F.3d at 689–93 (Coffey, J., dissenting) (emphasizing that the Freedom of Access to Clinic Entrances Act criminalizes the "purely non-eco-nomic activity (i.e., the civil disobedience) of anti-abortion protesters," which is "one step removed from the commercial enterprise") (quotations omitted).

13. Some statutes require that the government prove that the activities at hand substantially relate to interstate commerce. *See, e.g.*, 18 U.S.C. § 2119 (carjacking conviction requires proof that vehicle involved was "transported, shipped, or received in interstate or foreign commerce"). Courts have required a low threshold of proof of interstate relation for these statutes. *See, e.g., United States v. Johnson*, 22 F.3d 106, 107–09 (6th Cir.1994) (finding that a car manufactured in Smyrna, Tennessee and shipped to Chattanooga, Tennessee by way of Georgia and subsequently carjacked in Chattanooga meets the requisite jurisdictional standard).

14. In the case at hand, there was no evidence that defendants were engaged in a gambling enterprise that filled organized crime coffers. This case appears to be one of those "rare instances where a gambling operation meeting the requirements of 1955 will be a purely local operation, in no way connected with organized crime." *Sacco*, 491 F.2d at 1000. Congress, however, may regulate commercial activities that, although intrastate in nature, comprise a class of activities that substantially affect interstate commerce.

The Supreme Court cited *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), as an example of appropriate congressional regulation. *Lopez*, —— U.S. at ——, 115 S.Ct. at 1630.[15] *Perez* upheld 18 U.S.C. § 891, which outlawed extortionate credit practices. Like § 1955, § 891 was a criminal statute that punished commercial activity. Section 891 primarily regulated intrastate activity and did not contain any jurisdictional interstate element. However, attached to it were extensive legislative findings and history that analyzed the burden that extortionate credit practices placed on interstate commerce. *Perez*, 402 U.S. at 155–57, 91 S.Ct. at 1362–63. Under these circumstances, the Supreme Court confirmed that § 891 "substantially affected interstate commerce" and was therefore properly enacted. *Lopez*, —— U.S. at ——, 115 S.Ct. at 1630.[16]

*Lopez* casts a shadow on regulation that is tenuously related to interstate commerce.[17]

Courts may not excise individual instances of a class of commercial activities that is within the reach of federal power. *Perez v. United States*, 402 U.S. 146, 154, 91 S.Ct. 1357, 1361, 28 L.Ed.2d 686 (1971); *see also Lopez*, —— U.S. at ——, 115 S.Ct. at 1630; *Maryland v. Wirtz*, 392 U.S. 183, 192–93, 88 S.Ct. 2017, 2021–22, 20 L.Ed.2d 1020 (1968); *Wickard v. Filburn*, 317 U.S. 111, 127–28, 63 S.Ct. 82, 90–91, 87 L.Ed. 122 (1942); *United States v. Pack*, 16 F.3d 1222, No. 92–3872, 1994 WL 19945, at \*2 (6th Cir. Jan. 25, 1994) (per curiam) ("If the class of activities is within the reach of the federal power and the regulation imposed is reasonable, a court's investigation is concluded. There is no need for inquiry on a case-by-case basis or proof that a particular activity had a [substantial] effect on commerce.") (quoting *Sacco*, 491 F.2d at 999); *cf. Gomez*, 87 F.3d at 1095–96 (noting that once the commercial nature of the activity is established, the courts must consider the aggregate effect of the activity on the commercial market). Thus, if the structure of § 1955 is constitutional, this particular conviction will be upheld.

**15.** This court also cited *Perez* for support in previously upholding the constitutionality of § 1955. *See United States v. Leon*, 534 F.2d 667, 673–74 (6th Cir.1976).

**16.** This case does not mirror *Perez* exactly. Section 1955 incorporates state gambling law violations as an element of the federal offense. While § 891 generically criminalized loan-sharking, variegated gambling activities can be sanctified by individual states. This "opt-out" measure casts doubt upon congressional findings that such activities negatively burden interstate commerce. Nonetheless, this court will defer to Congressional findings that gambling ventures of this nature affect interstate commerce. *See infra* note 14 and accompanying text; *see also Leon*, 534 F.2d at 673 (rejecting argument that state law prerequisite makes the statute vague and unconstitutional); *United States v. Palmer*, 465 F.2d 697, 699 (6th Cir.) (per curiam) ("[T]he contention that [§ 1955] hinges on state law and is therefore an unconstitutional delegation of congressional authority [will not] stand scrutiny."), *cert. denied*, 409 U.S. 874, 93 S.Ct. 119, 34 L.Ed.2d 126 (1972).

While this court questions the wisdom of "criminalizing conduct already denounced as criminal by the States," *Lopez*, —— U.S. at —— n. 3, 115 S.Ct. at 1631 n. 3, it should be noted that Congress did not attempt to displace policy choices in those states that have legalized different forms of gambling. Because § 1955 criminalizes only those enterprises that first violate state law, Congress displayed some sensitivity and respect for federal-state comity and avoided unwarranted intrusion in an area traditionally reserved to the states. *See id.*; *accord United States v. Culbert*, 435 U.S. 371, 379, 98 S.Ct. 1112, 1116–17, 55 L.Ed.2d 349 (1978) (finding that Congressional prohibition of conduct already criminalized under state law does not necessarily disturb federal-state comity).

**17.** Courts have cited *Lopez* to require a more "direct" effect on interstate commerce. *See Pinckney*, 85 F.3d at 7 (rejecting argument that "goods sold or distributed in Brooklyn auto body shops will inevitably enter interstate commerce" pursuant to "chop-shop" charge); *Denalli*, 73 F.3d at 330 (maintaining that the destruction of a residence, which housed a computer that was occasionally used for work-related purposes, does not affect interstate commerce); *Pappadopoulos*, 64 F.3d at 528 ("The arson of [this house] has only a remote and indirect effect on interstate commerce."); *United States v. Grey*, 56 F.3d 1219, 1225 (10th Cir.1995) (finding that the exchange of $200 in Federal Reserve notes failed to have "even a minimal effect on interstate commerce"); *United States v. Klingler*, 61 F.3d 1234, 1239–40 (6th Cir.1995) (requiring more than tenuous connection to trigger federal jurisdiction); *cf. Olin Corp.*, 927 F.Supp. at 1522 (employing *Lopez* to question the constitutionality of CERCLA); *see also Hoffman*, 923 F.Supp. at 813 (finding that non-violent physical obstruction of reproductive health service clinics does not affect interstate commerce). *But see United States v. Baker*, 82 F.3d 273, 275–76 (8th Cir.1996) (upholding conviction under the Travel Act while citing *Lopez*; defendant's accessing of a local automatic teller machine [ATM], which was part of an interstate network of ATMs, to promote extortion was a use of a "facility in interstate or foreign commerce"); *United States v. Griffith*, 85 F.3d 284, 288 (7th Cir.1996) (conceding that

*Lopez,* however, does not mandate that § 1955 be invalidated. Until the Supreme Court provides a clearer signal or cogent framework to handle this type of legislation, this court is content to heed the concurrence of two Justices that the history of Commerce Clause jurisprudence still "counsels great restraint." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1634 (Kennedy, J. concurring). Section 1955, in language, purpose, and legislative history, better resembles commercial regulation than does § 922(q). *See Lopez,* —— U.S. at ——, 115 S.Ct. at 1633 ("[T]he question of congressional power under the Commerce Clause 'is necessarily one of degree'") (citation omitted). Section 1955 compares favorably to the statute analyzed in *Perez.* As a result, we affirm that 18 U.S.C. § 1955 is a proper exercise of congressional power under the United States Constitution.

## II. *The Applicability of 18 U.S.C. § 1955*

### A.

■ To be illegal under § 1955, the gambling operation in question must "involve[ ] five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business." 18 U.S.C. § 1955(b)(1)(ii). Defendants contend that fewer than five persons "conducted" such illegality; therefore, the requirements of the statute were not met.

Defendants explain that only three persons "conducted" business at Amusement, Inc. They employ dictionary definitions and clever analogy to show that "conduct," in every day usage, does not denote "participate in" or "carry on." Courts, however, have broadly interpreted "conduct" in the context of § 1955. The Supreme Court, though not directly interpreting § 1955, nonetheless suggested that "[i]t is participation in the gambling business that is a federal offense," *Sanabria v. United States,* 437 U.S. 54, 70, 98 S.Ct. 2170, 2182, 57 L.Ed.2d 43 (1978), and "[n]umerous cases have recognized that 18 U.S.C. § 1955 proscribes any degree of participation in an illegal gambling business, except participation as a mere bettor." *Id.* at 71 n. 26, 98 S.Ct. at 2182 n. 26. This court has added that "[t]he pleasure of participation and association in a gambling enterprise which otherwise meets the statutory test is sufficient." *United States v. Rowland,* 592 F.2d 327, 329 (6th Cir.1979); *see also United States v. Merrell,* 701 F.2d 53, 55 (6th Cir.) (serving coffee to bettors and cleaning up after they left was enough to sustain a conviction under § 1955), *cert. denied,* 463 U.S. 1230, 103 S.Ct. 3558, 77 L.Ed.2d 1415 (1983).

Defendants argue that these cases preceded the Supreme Court's ruling in *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). In *Reves,* the Court concluded that "to conduct or participate, directly or indirectly, in ... [an] enterprise's affairs" indicates "some degree of direction." *Id.* at 177–78, 113 S.Ct. at 1169.[18] However, the Court specifically distinguished *Reves* from *Sanabria:* " '[C]onducts' has been given a broad reading in [§ 1955's] context to distinguish it from 'manages, supervises, [or] directs.' " *Id.* at 178 n. 3, 113 S.Ct. at 1169 n. 3. This broad reading of "conduct," sanctioned by the Supreme Court, will remain undisturbed.

### B.

■ Although defendants query whether a payout from a video poker machine constitutes gambling,[19] the main thrust of their

"[o]ne can imagine a scenario where a local prostitution offense might lack a federal dimension" but still upholding conviction for money laundering statute, 18 U.S.C. § 1956, in part because funds from a localized but illicit prostitution enterprise were mailed from Illinois to Colorado).

18. The Supreme Court was interpreting a RICO statute. Especially relevant is that petitioners in *Reves* urged the Court to interpret "conduct" as "carry on." 507 U.S. at 178, 113 S.Ct. at 1169–70.

19. This contention appears to have little merit. Under Tennessee law, "[a] person commits an offense who knowingly induces or aids another to engage in gambling, and ... [i]ntends to derive or derives an economic benefit other than personal winnings from the gambling." Tenn. Code Ann. § 39–17–503(a). "Gambling" is defined as "risking anything of value for a profit whose return is to any degree contingent on chance." *Id.* § 39–17–501(1). These liberalized definitions include payouts from playing video poker machines. *See T & W Enter. v. Casey,* 715 S.W.2d 356, 358–59 (Tenn.Ct.App.1986); *Fergu-*

next argument is that leasing these machines did not violate Tennessee law. An essential element for conviction under § 1955 is that the illegal gambling business be in "violation of the law of the State . . . in which it is conducted." 18 U.S.C. § 1955(b)(1). Alleging that they have not violated the law of Tennessee, defendants assert that they may not be prosecuted for this offense.

The defendants correctly note that the business of leasing video poker machines is a lawful, taxable privilege in Tennessee. Tenn. Code Ann. § 67–4–507. By paying the proper tax, defendants were vested with the privilege of leasing the machines to location owners. Defendants contend that because their action—leasing the machines—was within the scope of the privilege for which they paid the tax, this activity was exempted from criminal prohibitions, even if the end-users employed the machines for gambling.

This privilege, however, continues only so long as the privileged actor remains within the scope of his lawful licensed business. An actor who strays beyond the lawful privilege is not protected and can be criminally charged. The privilege for leasing a coin-operated amusement device does not extend to "any device operated for the purpose of unlawful gambling." Tenn.Code Ann. § 67–4–507(1).[20] Defendants and the lessees of the machines anticipated that the machines would be used to gamble. By arranging to reimburse lessees for cash payouts to successful players, defendants stepped beyond the lawful privilege. Defendants helped to

induce gambling and intended to "derive an economic benefit" from the gambling, violating § 39–17–503(a). Consequently, they were properly charged under 18 U.S.C. § 1955.

### III. Sentencing Guideline Provisions

■ Defendant Donald Wall contends that it was improper for the district court to enhance his offense level by four points based upon his leadership role in the gambling venture.[21] He alleges that the underlying offense and the base offense level[22] already accounted for his leadership role, thereby making the enhancement a double counting.

■ Courts generally do not permit double counting under USSG § 3B1.1 when the offense of conviction reflects an inherent control or leadership role, *see, e.g., United States v. Stevenson,* 6 F.3d 1262, 1269–70 (7th Cir. 1993), or when the same conduct is penalized under a separate guideline provision. *See, e.g, United States v. Chichy,* 1 F.3d 1501, 1505–07 (6th Cir.), *cert. denied,* 510 U.S. 1019, 114 S.Ct. 620, 126 L.Ed.2d 584 (1993). The difficulty in defendant's position is that § 1955 warrants a conviction of those who may not lead or manage the enterprise. Moreover, the base offense level is not strictly applied to leaders or organizers—one merely had to "engage" in a gambling business to receive this level. USSG § 2E3.1(a)(1). As a result, the four-point enhancement is not a double counting.[23]

**AFFIRMED.**

---

son v. State, 628 S.W.2d 37, 38–39 (Tenn.Crim. App.1981).

**20.** Tenn.Code Ann. § 67–4–507(f) confirms that "[n]othing in this section, including payment of the tax provided for herein, shall be construed to make legal an otherwise illegal device, or to authorize or permit gambling on any device whatsoever."

**21.** USSG § 3B1.1(a) provides that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels."

**22.** USSG § 2E3.1(a), the base offense level for gambling offenses, provides for levels of:

(1) **12** if the offense was (A) engaging in a gambling business;

(B) transmission of wagering information; or
(C) committed as part of, or to facilitate, a commercial gambling operation;
or
(2) **6**, otherwise.

**23.** The circumstances surrounding this case make it inapposite to the cases cited by defendant. In *United States v. Romano,* 970 F.2d 164, 166–67 (6th Cir.1992), and *Chichy,* 1 F.3d at 1505–07, this court held that the district court engaged in prohibited double counting by enhancements under § 3B1.1 and § 2F1.1(b)(2). However, § 2F1.1(b)(2), the base offense level for deceit and fraud, is unlike the gambling base offense level because it permits an increase of two levels for "more than minimal planning." Moreover, recent amendments to the Guidelines have abrogated these particular provisions in *Romano* and *Chichy. See* USSG § 1B1.1, com-

BOGGS, Circuit Judge, concurring in part and dissenting in part.

Before *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), Congress's commerce powers were unlimited.[1] "[One] wonder[s] why anyone would make the mistake of calling it the Commerce Clause instead of the 'Hey, you-can-do-whatever-you-feel-like Clause.'" Judge Alex Kozinski, *Introduction to Volume Nineteen,* 19 Harv. J.L. & Pub. Pol'y 1, 5 (1995). In light of the text of the Commerce Clause[2]: "Could anyone say with a straight face that the consumption of homegrown wheat [in *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942) ] is 'commerce among the several states?'" Richard A. Epstein, *The Proper Scope of the Commerce Power,* 73 Va. L.Rev. 1387, 1451 (1987). *Lopez* has made us consider anew the concepts we had become used to accepting without comment. If we are to be true to our function as a intermediate federal court, we must carefully examine *Lopez* to see what limits it has placed on the formerly limitless Commerce Clause jurisprudence of the Supreme Court.

It is clear that *Lopez* represents some revival of the slumbering doctrine of enumerated powers. No longer will a simple invocation of the commerce power by Congress substitute for a detailed analysis into exactly how a congressional enactment can fairly be said to "regulate Commerce ... among the several States." I believe the court's opinion in this case does not adhere to the new limits *Lopez* has established on congressional power under the Commerce Clause. Instead, the court upholds the stat-

ute at issue in this case, 18 U.S.C. § 1955, by focusing on only one part of the *Lopez* test—the determination of whether a regulated activity is commercial in nature—and concluding that gambling is more commercial than the gun possession regulated in the statute struck down in *Lopez.* The court also seems overly impressed with the existence and volume of congressional findings. Applying a more detailed *Lopez* analysis leads me to the conclusion that § 1955 is not within Congress's commerce power, and I therefore dissent.

I do not question the court's caution, *op.* at 1451–52, in approaching a challenge to a statute based on the Commerce Clause—courts should be hesitant to use their power to strike down Congress's enactments. *Hodel v. Indiana,* 452 U.S. 314, 323, 101 S.Ct. 2376, 2383, 69 L.Ed.2d 40 (1981) ("It is established beyond peradventure that 'legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality ....'") (citing *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976)). *Cf. Erznoznik v. City of Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975) (emphasizing caution before striking down a state statute as facially unconstitutional). Especially given the intricacies of *Lopez,* reasonable judges may differ as to how this case should be resolved, based on that new precedent. *Lopez* should not be treated as an aberration, however, simply because its newness makes unclear the contours of the boundaries the

---

ment. (n.4); *United States v. Cobleigh,* 75 F.3d 242, 251 (6th Cir.1996).

In *Stevenson,* 6 F.3d at 1269–70, the Seventh Circuit prohibited double counting under § 3B1.1 because the crime of conviction (hiring a minor to participate in a crime) already encompassed the concept of "leadership." However, § 1955 does not exclusively target leaders. Wall's base offense level was the result of engaging in a gambling operation; his sentence was enhanced because he managed that operation. *See, e.g., United States v. Trupiano,* 11 F.3d 769, 775 (8th Cir.1993).

**1.** *See* Laurence Tribe, *American Constitutional Law* § 5–4 to 5–7, at 305–13 (2d ed.1988) (cata-

loging initial prevalence of view that Congress's Commerce Clause powers were broad, giving way to a "formalistic" reading of the Commerce Clause, in turn giving way to the modern, virtually unbounded reading of the Commerce Clause); Jesse Choper, *The Supreme Court and Unconstitutional Conditions: Federalism and Individual Rights,* 4 Cornell J.L. & Pub. Pol'y 460, 463 (1995) (predicting *Lopez* would go the other way because the Commerce Clause was such a nonexistent limit on federal power, "[t]he true surprise will be if there are many dissenting votes").

**2.** "The Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes...." U.S. Const. art. I, § 8, cl. 3.

Supreme Court intends to impose on congressional power.[3]

The concurring opinion of Justices Kennedy and O'Connor in *Lopez* only amplifies the uncertain dimensions of congressional power. These two Justices indicated they believe that *Lopez* does not "call in question the essential principles now in place respecting the congressional power to regulate transactions of a commercial nature." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1637 (Kennedy, J., concurring). It must be stressed, however, that *Lopez* is not a plurality opinion, with a majority merely concurring in the result that the statute is unconstitutional. Both Justices Kennedy and O'Connor fully endorsed the majority opinion written by Chief Justice Rehnquist. Therefore, I read the Kennedy-O'Connor concurrence to sound a note of caution about the scope of *Lopez*, not a note of paralysis. It is true that the "spirit" of *Lopez* cannot be applied indiscriminately or expanded without further encouragement from the Supreme Court, but *Lopez* must currently be examined with a deliberate and close focus on the precise reasoning used therein. When this intellectual spadework is performed, however, one sees the "cogent framework," *op.* at 1452, for Commerce Clause analysis that the court thinks is lacking.

Because of the uncertainty surrounding *Lopez*, and especially in light of the caveats contained in the Kennedy-O'Connor concurrence, the district courts [4] and the courts of appeals [5] face the problem of how to implement *Lopez* without overstepping their authority. I start with the proposition that *Lopez* means something and is not simply an aberration designed to strike down one statute, the Gun-Free School Zones Act ("GFSZA"), with no general doctrinal basis. Indeed, a careful reading of *Lopez* leads me to the conclusion that a law premised on the Commerce Clause is constitutional only if it regulates:

(1) channels of interstate commerce, *Lopez*, [—— U.S. at ——] 115 S.Ct. at 1629;

(2) instrumentalities of interstate commerce or persons or things in interstate commerce, whether the threat the regulation is designed to address comes from interstate or intrastate activities, *ibid.*; or,

(3) activities having a substantial effect on interstate commerce, *id.* [at ———— ——, 115 S.Ct.] at 1629–30, which in turn requires an inquiry into whether:

—the regulation controls a commercial activity or an activity necessary to the regulation of some commercial activity, *id.* [at ———— ——, 115 S.Ct.] at 1630–31;

—the statute includes a jurisdictional nexus requirement to ensure that each

**3.** Richard A. Epstein, *Constitutional Faith and the Commerce Clause*, 71 Notre Dame L.Rev. 167, 167 (1996) (expressing uncertainty about whether *Lopez* will be "a flash in the pan" or "usher in a new age of constitutional restraint"); Mark Tushnet, *Living in a Constitutional Moment?: Lopez and Constitutional Theory*, 46 Case W. Res. L.Rev. 845 (1996) (exploring whether Lopez is a constitutional event on the same order as the ratification of the 14th Amendment or the New Deal); John P. Frantz, Note, *The Reemergence of the Commerce Clause as a Limit on Federal Power*, 19 Harv. J.L. & Pub. Pol'y 161, 167 (1995) (unclear whether *Lopez* "an aberration or a watershed"); Charles B. Schweitzer, Comment, *Street Crime, Interstate Commerce, and the Federal Docket: The Impact of United States v. Lopez*, 34 Duq. L.Rev. 71 (1995) ("implications of the decision are uncertain and potentially far-reaching"); William H. Freivogel, *Uncertainty Surrounds Court Ruling on Commerce: But Experts Agree Ruling Limits Congress, May Jeopardize Laws*, St. Louis Post–Dispatch, May 2, 1995, at 11B (canvassing law professors and attorneys who make contradictory predictions about what *Lopez* means for constitutional law).

**4.** *United States v. Campbell*, 891 F.Supp. 210, 212 (M.D.Pa.1995) (conceding that *Lopez* represents a significant shift in constitutional law, but maintaining that, as a district court, it lacked the authority to strike down a different statute on Commerce Clause grounds in light of more specific pre-*Lopez* Supreme Court precedent on point).

**5.** Joseph Calve, *Anatomy of a Landmark*, Conn. L. Trib., Aug. 14, 1995, at 1 (Circuit Judge Garwood, author of the Fifth Circuit's *Lopez* opinion, noting that when *Lopez* was before the court of appeals he proceeded on the theory that the Gun–Free School Zones Act was unconstitutional because it lacked congressional findings, rather than on a theory that returned to first principles, in keeping with his proper role as an intermediate appellate court judge).

regulated instance of the activity affects interstate commerce, *ibid.;* and —the rationale offered to support the constitutionality of the statute (i.e., statutory findings, legislative history, arguments of counsel, or a reviewing court's own attribution of purposes to the statute being challenged) has a logical stopping point, so that the rationale is not so broad as to regulate on a similar basis all human endeavors, especially those traditionally regulated by the states, *id.* [at ———— ————, 115 S.Ct.] at 1631–33.

Unfortunately, this analytical framework, particularly in relation to the sub-parts of the "substantial effects" test, is not laid out as clearly in *Lopez* as it might have been. Nevertheless, each of the points summarized above is taken directly from *Lopez* and this synthesis represents the most logical way to give a fair reading to *Lopez.*

In my view, § 1955 obviously fits into neither of the first two categories. Whether § 1955 fits into the third, "substantial effects" category, is a more difficult inquiry. Applying the three sub-parts of the *Lopez* substantial effects test leads me to the conclusion that the activity regulated by § 1955 does not have a substantial effect on interstate commerce and that the statute is therefore unconstitutional. While § 1955 regulates commercial activity, it has neither a jurisdictional nexus requirement nor supporting rationales with any logical stopping point. The court's opinion in this case, on the other hand, finds constitutional support for § 1955 by straying from the analytical framework set forth in *Lopez.* The court's arguments are generally too broad, lacking in logic, or otherwise in disharmony with *Lopez.* Most importantly, the court takes the findings in the statute and legislative history of § 1955 at face value, without pausing to analyze whether those findings have a logical stopping point that would prevent all human endeavors from being regulated on the same basis, as we are required to do by *Lopez.*

In a nutshell, this case involves federal regulation of all gambling that is forbidden by state law, if relatively minor conditions are met with respect to the number of individuals, the amount of money, and the period of time involved in the gambling operation. Section 1955 is not limited to gambling that is in interstate commerce or substantially affects interstate commerce. The statute is not necessary to a nationwide scheme to control either legal or illegal gambling. And, on the facts of this case, the connection of the defendants' gambling operation to interstate commerce is very tenuous. The gambling at issue here involves Tennesseeans standing or sitting in Tennessee, manipulating buttons on a machine located in Tennessee, and receiving pay-offs in Tennessee. The only connection that the gambling operation in this case had to interstate commerce was that the video poker machines used in the operation were shipped to Tennessee from New Jersey.

In the analysis below, I first outline the facts of the case, set forth my points of agreement with the court, and address certain preliminary arguments based on pre-*Lopez* precedent. Second, I lay out my analysis of *Lopez* and apply it to § 1955. Finally, I refute the five arguments the court makes to defend the constitutionality of § 1955.

## I. FACTS OF THE CASE AND PRELIMINARY ARGUMENTS

### A. Facts of the Case and Elements of a Violation of § 1955

Here are what I think are the relevant facts in this case, including some not touched upon by the court: Nathan and Donald Wall ran a video poker machine gambling business exclusively in Nashville area restaurants, bars and other establishments in violation of Tennessee law. The Walls employed seven other people to help them conduct their gambling operation. Between 1989 and September 1991, the Walls' business operated for at least two consecutive days, earning gross revenues during these two days that exceeded $2,000. During this same period, the business generated approximately $2 million in gross revenues. In their business, the Walls used twenty video poker machines purchased from Lucky Distributing and Amusement Co., Inc. on June 12, 1989 for $10,622.50. The machines were shipped directly

to the Walls' company from SMS Manufacturing Corp. in New Jersey at Lucky's request on August 3, 1989.[6] On June 2, 1994, the United States Attorney charged the Walls in a criminal information with operating a gambling business in violation of § 1955. The defendants ultimately pled guilty to this charge, reserving the right to challenge by motion the validity of the criminal information. The defendants moved to dismiss the information on July 7, 1994. The district court denied the motion on August 12, 1994.

While it is unnecessary for me to consider whether Part III of the court's opinion addressing the sentencing argument advanced by Donald Wall is correct, I concur in Part II of the opinion, which concludes that the Walls satisfied the elements constituting a violation of § 1955. If the Walls were correct that their conduct did not violate the statute, there would be no need to consider the constitutional argument they raise. *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 500–01, 99 S.Ct. 1313, 1318–19, 59 L.Ed.2d 533 (1979) (a federal court must engage in any reasonable construction of a statute that allows it thereby to avoid a constitutional question); *United States v. Five Gambling Devices*, 346 U.S. 441, 449–50, 74 S.Ct. 190, 194–95, 98 L.Ed. 179 (1953) (plurality) (applying the canon of avoiding constitutional questions to a statute banning the shipment of gambling machines in interstate commerce). As the court rightly holds, the Walls' statutory arguments are wholly lacking in merit under both the text of § 1955 and Sixth Circuit case law interpreting § 1955.

### B. Lack of National Uniformity in § 1955

Before addressing the reasoning used in the court's opinion, it is also necessary to consider a Commerce Clause argument the Walls make that is not based on *Lopez*. The Walls appear to have drawn this argument from *United States v. Sacco*, 491 F.2d 995, 1003 (9th Cir.1974) (en banc) (upholding § 1955 against a Commerce Clause challenge). On the basis of a similar argument rejected in *Sacco*, the Walls challenge the lack of national uniformity in § 1955. In order to violate § 1955, one must first violate a state's gambling laws. Therefore, if a particular kind of gambling is not illegal in a state, it is not a violation of federal law to engage in that particular kind of gambling in the state. As a result, § 1955 applies to the same gambling activities differently depending on the state or states in which that gambling activity takes place. The Constitution specifically imposes uniformity requirements on some forms of economic regulation, for instance on the power to lay duties and excises.[7] *Currin v. Wallace*, 306 U.S. 1, 14, 59 S.Ct. 379, 386, 83 L.Ed. 441 (1939). The Commerce Clause includes no such requirement, however. Therefore, by negative implication, it has been held that no uniformity limitation can be engrafted onto the Commerce Clause. *Ibid.* Based on *Currin*, I conclude that the lack of uniformity in § 1955 is not fatal to its constitutionality under the Commerce Clause. Although, as I discuss below at pp. 1479–81, I do think that § 1955's peculiar manner of intruding into the criminal law related to gambling, an area of regulation traditionally reserved to the states, does implicate the Tenth Amendment.[8]

### C. Section 1955, the Bar Doctrine, and the Lottery Case

Another Commerce Clause argument not addressed by the court is one the government could have made to defend the constitu-

---

6. The invoice contained the following in "small print": "The operation of these games and the features therein may be subject to various state and local laws and regulations. It's not intended herein to solicit the sale of such games in any jurisdiction wherein the same may not be lawfully sold or *operated*." (Emphasis supplied.) The Walls apparently did not heed, or did not read, this warning.

7. "[A]ll Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art. I, § 8, cl. 1. *See also* U.S. Const. art. I, § 8, cl. 4 (requiring bankruptcy and naturalization laws to be uniform).

8. "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the states respectively, or to the people." U.S. Const. amend. X.

tionality of § 1955, but either overlooked or did not choose to make. It is an argument too important not to consider, however, because it involves the only Commerce Clause case I am aware of in which the Supreme Court addressed the federal regulation of gambling. In *Champion v. Ames*, 188 U.S. 321, 358, 23 S.Ct. 321, 327–28, 47 L.Ed. 492 (1903), commonly known as the Lottery Case, the Supreme Court upheld the constitutionality of a federal statute that prohibited the interstate transportation of lottery tickets [9], even though the Commerce Clause only gives Congress the power to "regulate" commerce. The Court held that the power to regulate encompasses the power to prohibit regulated activities in their entirety. This holding has become known as the "bar doctrine." *See* Lino Graglia, *United States v. Lopez: Judicial Review under the Commerce Clause*, 74 Tex. L.Rev. 719, 733–38 (1996) (discussing the development of the bar doctrine). The bar doctrine was extended in *Hoke v. United States*, 227 U.S. 308, 322, 33 S.Ct. 281, 284, 57 L.Ed. 523 (1913), to uphold the constitutionality of the Mann Act, which, *inter alia*, prohibited the interstate transportation of women for the purpose of engaging in prostitution.

Professor Graglia argues that the evolution in the early twentieth century of the bar doctrine constituted as substantial an erosion of the enumeration of powers as the creation of the mere effects on interstate commerce test pioneered by the New Deal Supreme Court. Central to his thesis that *Lopez* represents a minor change in constitutional law is that *Lopez* did not curtail the bar doctrine in any way. Graglia, 74 Tex. L.Rev. at 755. Whether Graglia's conclusion that the bar doctrine survives *Lopez* is correct or not is irrelevant to the Walls' case, however, as the bar doctrine is not implicated here.[10] Sec-

tion 1955 does not mention interstate commerce at all. Obviously, under the bar doctrine Congress could have criminalized the interstate transportation of video poker machines [11] (*Champion*) or it could have criminalized the interstate transportation of video poker machines with the intent to use them in the commission of some independently defined crime (*Hoke*). *See United States v. Olin Corp.*, 927 F.Supp. 1502 (S.D.Ala.1996) (striking down the Comprehensive Environmental Response, Compensation, and Liability Act based on *Lopez* and noting that "regardless of the congressional motive or the broad dicta in the *Champion* opinion, the Lottery Act regulated a matter (cross-border movement of certain commerce) which the Court's interpretation of the dormant Commerce Clause had placed beyond the power of the states."). Section 1955 does not criminalize either of the general categories of activities addressed in *Champion* or *Hoke*, however. In fact, § 1955 criminalizes activity that could be completely unconnected to interstate commerce. Running a card game, where the playing cards were made from paper manufactured wholly within one state by unsophisticated methods using wood, chemicals, and machinery from that state, if directed as an illegal gambling operation under state law, would violate § 1955 as long as five people were involved in conducting the operation and the operation either continued for more than 30 days or had gross revenue of $2,000 or more on any single day. *See* Robert W. Lee, *18 U.S.C. § 1955: Who Conducts an Illegal Gambling Business?—It's Just a Roll of the Dice*, 12 W. St. U.L.Rev. 239, 244 (1984) ("Time has shown … that relative few continuous gambling operations are outside the parameters of the federal legislation."). Section 1955 is substantially

---

**9.** The statute also prohibited advertising connected with lotteries that required the interstate transportation of tickets. *Champion*, 188 U.S. at 322, 23 S.Ct. at 321.

**10.** For a humorous example of how well-established the bar doctrine has become, see *Goetz v. Glickman*, 920 F.Supp. 1173, 1180 (D.Kan.1996) (upholding the Beef Promotion and Research Act of 1985 against an argument that Congress can

*only* restrict or prohibit commerce not promote it). The litigant in *Goetz* had the text and the developmental history of the Commerce Clause backwards.

**11.** Indeed, Congress has done so in 18 U.S.C. § 1953, the current version of the statute addressed in *Five Gambling Devices*, 346 U.S. 441, 74 S.Ct. 190, 98 L.Ed. 179.

different from either the statute upheld in the Lottery Case or in *Hoke*.[12]

## II. THE *LOPEZ* FRAMEWORK AND ITS APPLICATION TO THIS CASE

### A. Appropriate Level of Scrutiny

*Lopez* is unclear on the proper level of constitutional review that courts should now apply to Commerce Clause challenges. *See* David G. Wille, *The Commerce Clause: A Time for Reevaluation*, 70 Tul. L.Rev. 1069, 1090 (1996) ("the Court appeared to be applying a higher level of scrutiny [than rational basis scrutiny in *Lopez* ] and reasserting its constitutional role of judicial review by limiting Congress's power within particular, narrow boundaries"); Molly E. Homan, Comment, *United States v. Lopez: The Supreme Court Guns Down the Commerce Clause*, 73 Denv. U.L.Rev. 237 (1995) ("[t]he majority's analysis [in *Lopez* ] . . . raised the question of what level of review the courts should apply in future Commerce Clause cases"); *Leading Cases*, 109 Harv. L.Rev. 111, 111 (1995) (editors of the Harvard Law Review opining that it is unclear whether *Lopez* signals a note of caution in rational basis review or "indicates an aggressive new level of review, untrammeled by the obligation to defer to legislative findings"). I read *Lopez* as requiring courts to use more than mere rational basis scrutiny in reviewing challenges to Congress's commerce powers. *See* Epstein, *Constitutional Faith and the Commerce Clause*, 71 Notre Dame L.Rev. at 177 (*Lopez* represents a move "from rational basis (back) to intermediate scrutiny"); Wendy M. Rogovin, *The Politics of Facts: 'The Illusion of Certainty'*, 46 Hastings L.J. 1723, 1725 (1995) (interpreting *Lopez* and other recent decisions of the Rehnquist Court as moving away from deference to Congress and replacing a deferential approach with requirements that empirical data support congressional findings); Larry E. Gee, *Federalism Revisited: The Supreme Court Resurrects the Notion of Enumerated Powers by Limiting Congress's Attempt to Federalize Crime*, 27 St. Mary's L.J. 151, 191 (1995) (*Lopez* is the "first step" in moving to a "Commerce Clause jurisprudence . . . based in fact"); Stephen M. McJohn, *The Impact of United States v. Lopez: The New Hybrid Commerce Clause*, 34 Duq. L.Rev. 1 (1995) ("Although not explicitly rejecting the 'rational basis' precedents, the Court appears to have abandoned its previous deference to Congress in favor of its own independent assessment of the effect on commerce."); Graglia, *United States v. Lopez: Judicial Review under the Commerce Clause*, 74 Tex. L.Rev. at 752 (noting that *Lopez* surprisingly uses the words "rational basis" to support its adoption of the "substantial effects" test,[13] but that *Lopez* did not apply anything remotely like the rational basis test to the GFSZA); Herman Schwartz, *Court Abandons Rational–Basis Test*, Legal Times May 8, 1995, at 25–26 (author's position clear from the title chosen for his article); Deborah Jones Merritt, *Commerce!*, 94 Mich. L.Rev. 674, 677 (1995) (*Lopez* applies a "toughened rational basis standard"). *But see Doe v. Doe*, 929 F.Supp. 608, 613 (D.Conn.1996) ("*Lopez* reaffirmed the rationality test"). Though there is obviously nothing in *Lopez* to indicate that the Court was applying strict scrutiny, the Court was definitely not applying minimal, rational basis scrutiny to the GFSZA. Below, I provide my best under-

---

12. The Third Circuit has recently upheld, post-*Lopez*, an amendment to the federal statute at issue in the Lottery Case, 18 U.S.C. § 1301, which prohibited the communication across state lines of information related to lotteries. *Pic–A–State Pa., Inc. v. Reno*, 76 F.3d 1294, 1303 (3rd Cir.1996).

13. Chief Justice Rehnquist in his *Lopez* opinion mentions rational basis scrutiny at one point in *Lopez*, citing *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 276–80, 101 S.Ct. 2352, 2360–62, 69 L.Ed.2d 1 (1981), but then immediately cites his own concurrence in *Hodel* in a footnote for the proposition that "simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Lopez*, —— U.S. at —— n. 2, 115 S.Ct. at 1629 n. 2 (quoting *Hodel*, 452 U.S. at 311, 101 S.Ct. at 2391 (Rehnquist, J., concurring)). As Justice Souter's dissent in *Lopez* makes clear, *Lopez*, —— U.S. at —— ——, 115 S.Ct. at 1653–54 (Souter, J., dissenting), the majority of the Court certainly does not appear to be applying mere rational basis scrutiny. It is also important to note that Justice Kennedy's concurrence does not mention rational basis scrutiny.

standing of the type of intermediate scrutiny used in *Lopez.*

## B. Three Broad Categories of Activities that Congress Can Regulate under the Commerce Clause

As the court recognizes, *op.* at 1446, *Lopez* follows the tripartite test for Commerce Clause analysis set out by Justice Douglas in *Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 1359, 28 L.Ed.2d 686 (1971). Congress may properly regulate under its Commerce Clause power: (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in commerce, even though the threat may come only from intrastate activities"; (3) "activities that substantially affect interstate commerce." *Lopez,* — U.S. at — – —, 115 S.Ct. at 1629–30.[14] The government in this case concedes that it defends the statute exclusively because of the substantial effect on interstate commerce of gambling businesses made illegal by state law.[15]

## C. *Lopez*'s Explication of the Substantial Effects Test

In holding that the GFSZA did not regulate activity that substantially affected interstate commerce, the Court noted that (1) the possession of a gun near a school zone was not a commercial activity or an essential part of a larger regulation of commercial activity; (2) the GFSZA lacked a jurisdictional nexus requirement that would allow courts to ensure through case-by-case inquiry that a particular firearm possession substantially affects interstate commerce [16]; and, (3) the rationales offered by the Solicitor General to show a substantial effect on interstate commerce did not have a logical stopping point that would prevent the regulation of all intrastate activity on a similar basis. *Lopez,* — U.S. at — – —, 115 S.Ct. at 1630–34. The tough question we face is how these three points of analysis interact: In order to be constitutional, must a statute satisfy all three sub-parts of this test? In what order should the three sub-parts be applied? Because the GFSZA satisfied none of the three sub-parts, the Court did not have to face these questions. But they cannot be ignored. *See United States v. Chesney,* 86 F.3d 564, 576–77 (6th Cir.1996) (Batchelder, J., concurring) (chastising many sister courts and commentators for reading *Lopez*'s analysis of the substantial effects test as only requiring that a statute pass muster under any one of the three points to be held constitutional).

My best answer to the open question of how the three points made by the Court interact is contained in the following framework for analysis of whether an activity

---

**14.** *Perez* allows regulation wherever commerce is "affected." *Lopez* makes it clear that commerce must be "substantially affected" by the activity to be regulated under the Commerce Clause. *Lopez,* — U.S. at —, 115 S.Ct. at 1630. This point makes the court's direct reliance on *Perez* to uphold § 1955 questionable. *See United States v. Chesney,* 86 F.3d 564, 578 n. 7 (6th Cir.1996) (Batchelder, J., concurring) (making a similar point).

**15.** Nor could the government have defended § 1955 under either of the other two routes to constitutionality under *Lopez.* It is clear that § 1955 regulates an activity that can take place wholly within state boundaries, not a channel of interstate commerce. Furthermore, § 1955 does not regulate an instrumentality of interstate commerce, for instance aircraft (*Perez,* 402 U.S. at 150, 91 S.Ct. at 1359–60) or a person or thing in interstate commerce. Gambling can be performed by individuals in a single state. And gambling is a service rather than a commodity. *Cf. United States v. Wilks,* 58 F.3d 1518, 1521 (10th Cir.1995) (applying *Lopez* to uphold against a Commerce Clause challenge a federal law reg-

ulating machine gun ownership and transfer because machine guns are "by their nature" "a commodity ... transferred across state lines for profit").

**16.** The Third Circuit has rejected the idea that the Supreme Court could have intended to impose a requirement that the particular instances of criminal activity charged under a federal statute with a jurisdictional nexus requirement must substantially affect interstate commerce. *United States v. Bishop,* 66 F.3d 569, 587–88 (3d Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 681, 133 L.Ed.2d 529 (1995). In light of the Supreme Court's statement in *Lopez* that, "[the GFSZA] contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession *in question* affects interstate commerce," this statement seems in error. *Lopez,* — U.S. at —, 115 S.Ct. at 1631 (emphasis added). The Third Circuit's argument depended upon two Supreme Court precedents, not directly on point, that preceded *Lopez.*

sought to be regulated substantially affects interstate commerce after *Lopez:* First, a reviewing court should determine whether the intrastate activity being regulated is commercial in nature or its regulation is an essential part of the regulation of some commercial activity.[17] If the activity is neither commercial nor is its regulation an essential part of the regulation of commercial activity, then that activity cannot be regulated under the Commerce Clause. If the intrastate activity is either commercial or its regulation is necessary to the regulation of a commercial activity, however, then a reviewing court needs to go on to the next question.

Second, that court must ask whether the statute contains a jurisdictional nexus requirement that limits jurisdiction over the intrastate activity generally to those instances of the activity that have some particular connection with interstate commerce. If a facial challenge is mounted to the constitu-tionality of a statute with a jurisdictional nexus requirement, then this challenge must be rejected; the regulation being challenged is facially constitutional under the Commerce Clause.[18] A jurisdictional nexus requirement should be read to invoke the full extent of Congress's Commerce Clause power. *Russell v. United States,* 471 U.S. 858, 859, 105 S.Ct. 2455, 2456, 85 L.Ed.2d 829 (1985). It should also be read, however, especially when vague or incomplete, to avoid constitutional difficulties.[19] If a statute contains a jurisdictional nexus requirement and the challenge is to the application of that requirement in a particular case, or the statute contains no jurisdictional nexus requirement, then the court must go on to the final question.[20]

Third, the court must ask whether the statute's constitutionality or the constitutionality of its application in a particular case is supported by (1) the findings in the statute

---

**17.** *Lopez* uses the words "economic" and "commercial" interchangeably. I consistently use the word "commercial" in this context.

**18.** For an example of a court noting the difference between a facial challenge and an as-applied challenge to the constitutionality of a statute under the Commerce Clause after *Lopez,* see *United States v. Medina,* 901 F.Supp. 59, 60 (D.P.R.1995) (deeming it premature to rule on whether the jurisdictional nexus requirement in 18 U.S.C. § 922(g)(1) was met after rebuffing a facial challenge to the statute's constitutionality based on *Lopez*).

**19.** For instance, even if the plain meaning of a jurisdictional nexus requirement permitted regulation of a non-commercial activity that was not essential to the regulation of some commercial activity, the plain meaning of the jurisdictional nexus requirement should be ignored. Instead, the jurisdictional nexus requirement should be read to comport with the first sub-part of the *Lopez* substantial effects test and permit the regulation only of commercial activities or activities essential to the regulation of commercial activities. *See Five Gambling Devices,* 346 U.S. at 449–52, 454–56, 74 S.Ct. at 194–96, 197–98 (reading jurisdictional nexus requirement so as to avoid a constitutional question in direct contravention of the plain meaning of that requirement).

**20.** Pre-*Lopez* Commerce Clause Supreme Court precedent establishes that jurisdictional nexus requirements are to be read as coextensive with Congress's Commerce Clause powers. Still, because constitutional questions are to be avoided through statutory interpretation where fairly possible, it makes sense initially to make the threshold determination that a particular activity falls within the terms of a plain meaning reading of jurisdictional nexus requirement before moving on to consider the three sub-parts of the *Lopez* substantial effects test. *See* the discussion of the Tenth Circuit's decision in *United States v. Grey,* 56 F.3d 1219 (10th Cir.1995), *infra* p. 1474 n. 44.

Also, some might contend that the Supreme Court's language, when discussing the jurisdictional nexus sub-part of the substantial effects test, authorizes a court to read into a statute a *nonexistent* jurisdictional nexus requirement and thereby save a statute from facial Commerce Clause attack. *See Lopez,* —— U.S. at ——, 115 S.Ct. at 1631 (discussing *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971)). *Lopez 's* analysis of *Bass,* however, only stands for the proposition that a statute with an ambiguous jurisdictional nexus requirement can be saved by creative statutory construction to avoid constitutional questions. *Lopez* does not permit a court to read a jurisdictional nexus requirement into a statute wholly lacking such a requirement. If it did, then perhaps the GFSZA might have been saved by this technique. Section 1955 contains no jurisdictional nexus requirement and therefore the *Bass* technique has no application to this case. For an example of an excellent district court opinion following the proper approach to reading a statute arguably creating commerce power difficulties after *Lopez,* see *United States v. Tidwell,* No. CIV. A. 94–CR–353, 1995 WL 764077, at *3–*5 (E.D.Pa. Dec. 22, 1995) (reading 21 U.S.C. § 848(e) to avoid *Lopez* difficulties).

or the legislative history of the statute [21], if there are any; (2) by the litigants' proffered defenses of the constitutionality of the statute [22]; or, (3) by the court's own attribution of congressional purpose to the statute.[23] This listing of potential supporting rationales is meant to state a hierarchy. In other words, with a typical statute the presence of statutory findings will obviate the need to consider findings in the legislative history or the other sorts of rationales farther down the hierarchy. The rationales offered to support the constitutionality of the statute, whatever their location in the hierarchy, must have a logical stopping point that would prevent them from being used to regulate any intrastate activity. In light of the Tenth Amendment, this is especially true when the federal government seeks to regulate activities that have historically been the province of the states. *Lopez,* —— U.S. at —— n. 3, 115 S.Ct. at 1631 n. 3 (noting that states possess the primary authority under our constitutional system to define and enforce criminal law). A statute that must be upheld on the third sub-part of the *Lopez* substantial effects test

that intrudes upon those areas of life that have traditionally been exclusively regulated by the states is highly unlikely to have the requisite logical stopping point. But, if at least one of the rationales does have such a logical stopping point, then the statute is insulated from facial constitutional challenge.[24]

In as-applied challenges to a statute with a jurisdictional nexus requirement or a logical stopping point, the test is whether the instance of the activity to be regulated falls within the terms of the jurisdictional nexus requirement or within the rationales having a logical stopping point offered to support the constitutionality of the statute. If the instance of the activity to be regulated falls within these parameters, then the as-applied challenge fails. If it is outside of these parameters, then the as-applied challenge succeeds.

For convenience, the flowchart at the top of the next page illustrates this understanding of the *Lopez* substantial effects test:

**21.** The *Lopez* Court specifically noted that it would have considered statutory findings made in connection with the GFSZA, if only Congress had made any. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631. The Court also indicated a willingness to consider legislative history. *Ibid.*

**22.** The *Lopez* Court's consideration of the rationales offered to defend the GFSZA by the Solicitor General establish that the Supreme Court will examine the rationales offered by a litigant to support the constitutionality of a statute under the Commerce Clause. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1632.

**23.** The *Lopez* Court also saw fit to respond to the purposes ascribed to the statute by Justice Breyer, writing in dissent. *Lopez,* —— U.S. at —— ——, 115 S.Ct. at 1632–33. Given the presumption of constitutionality, we should afford any statute not supported by findings, legislative history, or supporting rationales by a litigant a "last chance," in the form of a sensible attribution of purpose by the reviewing court.

**24.** The most contentious part of the reading of *Lopez* I advocate is the focus on whether the

congressional findings or other rationales offered to support the constitutionality of a statute have any logical stopping point. However, this inquiry is demanded by the Supreme Court's intensive scrutiny of the rationales offered by the government to uphold the GFSZA in *Lopez. Lopez,* —— U.S. at —— —— ——, 115 S.Ct. at 1632–33. A few courts have realized that *Lopez* requires courts to take a hard look at congressional findings and other rationales offered to support the constitutionality under the Commerce Clause of any statute that must be justified under the substantial effects test. *See, e.g., United States v. Parker,* 911 F.Supp. 830, 837–39 (E.D.Pa.1995) (rejecting the rationales, denominated by the court as the "basic necessities" and "federal subsidy" theories, offered by the government to support the constitutionality of the Child Support Recovery Act of 1992 ("CSRA")). *Hoffman v. Hunt,* 923 F.Supp. 791, 816 (W.D.N.C.1996) (after *Lopez,* courts must engage in "meaningful judicial review of Congress' findings"—congressional findings in that case were "insufficient" and supported "almost exclusively by anecdotal evidence"). *But see Doe,* 929 F.Supp. at 613 (calling *Lopez*'s rejection of the rationales offered to support the GFSZA by the Solicitor General mere "dicta").

## The *Lopez* Substantial Effects Test

Four important consequences of my analysis of the substantial effects test are: (1) non-commercial activities can be regulated, but their regulation must be essential to a larger regulation of some commercial activity; (2) not all commercial activities can be regulated by Congress; (3) a jurisdictional nexus requirement or a rationale with a logical stopping point can sometimes protect a statute from a facial Commerce Clause challenge, but not from an as-applied challenge; and (4) the fact that a statute regulates activities that have been traditionally regulated by the states (a Tenth Amendment concern) is relevant only if a statute's validity depends on whether the rationales offered to support its constitutionality have a logical stopping point because whether the traditional purview of state regulation is impinged

upon is crucial in testing whether a logical stopping point exists.

### D. Application of *Lopez*'s Substantial Effects Test to § 1955

#### 1. Commercial Activity

Section 1955 involves the regulation of what is obviously a commercial activity within the meaning of *Lopez*. Gambling is a diversion that people pay money to engage in. Some forms of gambling may be mere entertainment, but it is clear that § 1955 is directed at gambling businesses. Therefore, I do not need to consider whether the statute regulates non-commercial activity essential to the regulation of some commercial activity. I can move on to answer the second and third questions in the above framework. I pause only to address in advance one poten-

tial objection to this approach. Some have contended that analysis under *Lopez*'s substantial effects test should cease when the intrastate activities being regulated are determined to be commercial. I do not think that this is the proper way to read *Lopez*.

Proponents, perhaps including the court, of the view that all intrastate commercial activities can be regulated under *Lopez*'s substantial effects test point to Chief Justice Rehnquist's statement in *Lopez* that the Gun Free School Zones Act was "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez*, —— U.S. at ——–——, 115 S.Ct. at 1630–31. *See Cheffer v. Reno*, 55 F.3d 1517, 1520 (11th Cir.1995) (upholding the Freedom of Access to Clinic Entrances Act ("FACE") against a *Lopez*-based challenge because the provision of reproductive health services is commerce); *United States v. Lucero*, 895 F.Supp. 1421, 1423 (D.Kan. 1995) (FACE is constitutional because the provision of reproductive health services is commerce)[25]; *United States v. Smith*, 920 F.Supp. 245, 248 (D.Me.1996) (*Lopez* permits the regulation of any goods that "frequently travel" in interstate commerce[26]); *United States v. Najarian*, 915 F.Supp. 1460, 1472 n. 19 (D.Minn.1996) (*Lopez* only requires a "commercial nexus," which was satisfied even when intrastate distribution of a drug was being regulated by the FDA); John P. Frantz, Note, *The Reemergence of the Commerce Clause as a Limit on Federal Power*, 19 Harv. J.L. & Pub. Pol'y 161, 167–68 & n. 52 (1995) (all commercial activities are regulable under the Commerce Clause after *Lopez*).

The Court could not have intended to imply that all commercial activities could be regulated when it said that the GFSZA "is a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez*, —— U.S. at —— ——, 115 S.Ct. at 1630–31. Else, the word "interstate" in the Commerce Clause is rendered a nullity. Similarly, the fact that § 1955 is a criminal statute does not determine its (un)constitutionality, even though criminal laws are the traditional purview of the states. Some commercial regulation must be off limits to Congress under its commerce powers, just as all criminal regulation is not off limits to Congress.

*Lopez* also went to great lengths to make the lower federal courts aware that the test in connection with this third broad category of congressional power is not whether there is *any* effect on interstate commerce, but whether the effect is *substantial*. "We conclude, consistent with the great weight of our case law, that the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1630 (quoting *Maryland v. Wirtz*, 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 2024 n. 27, 20 L.Ed.2d 1020 (1968), which also required a substantial effect on interstate commerce). It would odd for the Supreme Court to emphasize this point if any commercial activity, whether intrastate or interstate, would be constitutionally regulable by Congress under its commerce powers per se.

Finally, the mere purchase of goods made in other states cannot be sufficient to permit congressional regulation of an intrastate commercial activity, especially by means of criminal statutes. For instance, here the Walls purchased video poker machines from a retailer in their own state. The machines were then shipped from New Jersey to the Walls at their retailer's request. If this is

---

**25.** *But see United States v. Wilson*, 73 F.3d 675, 692–93 (Coffey, J., dissenting) (7th Cir.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 46, —— L.Ed.2d —— (1996) ("I am at a loss to comprehend how the [anti-abortion] protesters, who were taking part in a local act of civil disobedience, can be classified as having engaged in a commercial activity.").

**26.** Verbatim, the *Smith* court stated, "the Drug Act bears a substantial relation to commerce by regulating the manufacture, distribution, and sale of controlled substances that frequently travel in *intrastate* commerce." *Smith*, 920 F.Supp. at 248. (Emphasis supplied.) I assume the court meant "interstate commerce," because the district court's point, taken in context, appeared to be that as long as enough instances of some activity were interstate in nature Congress could regulate the entire activity, even in its intrastate manifestations.

enough to authorize congressional regulation of the Walls' gambling business, then almost any activity in modern America may be federally criminizable. I consider this argument in more detail below (see p. 1466) in connection with the explicit findings Congress made when enacting § 1955. My basic point, however, is that the conclusion that an intrastate activity is commercial in nature does not end the *Lopez* inquiry under the substantial effects test.

## 2. Jurisdictional Nexus Requirement

Section 1955 does not have a jurisdictional nexus requirement that could ensure, on a case-by-case basis, that the intrastate gambling operations reached by the statute are sufficiently connected to interstate commerce to be regulated by Congress under its commerce powers.[27] Commentators have been nearly unanimous in recognizing the centrality of the lack of a jurisdictional nexus requirement in considering the validity of statutes after *Lopez*.[28] Even though § 1955 lacks a jurisdictional nexus requirement, there is one other way to save the statute from being struck down as unconstitutional: the rationales offered to support the statute might serve as a surrogate for a jurisdictional nexus requirement.[29] Determining whether this is the case requires an analysis of these rationales to discover whether they

27. *Contra United States v. Becker*, 461 F.2d 230 (2d Cir.1972), *vacated on other grounds*, 417 U.S. 903, 94 S.Ct. 2597, 41 L.Ed.2d 208 (1974); *United States v. Smaldone*, 485 F.2d 1333 (10th Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974). In these two court of appeals cases, imposition of the jurisdictional nexus requirement adopted in *Lopez* was rejected based on pre-*Lopez* Commerce Clause doctrine.

28. Kelly G. Black, *Removing Intrastate Lawsuits: The Affecting-Commerce Argument after United States v. Lopez*, 1995 B.Y.U. L.Rev. 1103, 1105 (1995) (discussing the importance of the jurisdictional nexus requirement and concluding that federal legislation proposed by the American Law Institute to centralize multiparty, multiforum lawsuits would be unconstitutional without an interstate nexus requirement); David S. Gehrig, Note, *The Gun-Free School Zones Act: The Shootout over Legislative Findings, the Commerce Clause, and Federalism*, 22 Hastings Const. L.Q. 179, 195–96 (1994) (noting application by the Supreme Court of a rule requiring clear statement by Congress of a desire to regulate purely intrastate activities to federal statutes with ambiguous jurisdictional nexus requirements in *Bass*, 404 U.S. at 338, 92 S.Ct. at 517); President William J. Clinton, *Message to Congress Transmitting the "Gun-Free School Zones Amendments Act of 1995,"* 31 Weekly Comp. Pres. Doc. 809 (noting that these Amendments add the jurisdictional nexus requirement that Attorney General Reno advised that the Supreme Court in *Lopez* required for constitutionality); Herb Kohl, *Kohl Fights to Reinstate Gun-Free School Zones Law*, Congressional Press Release, June 7, 1995, *available in* LEXIS, Nexis Library (Senators Kohl, Simon, Specter, Feinstein, Bradley, Lautenberg and Chafee making same argument as President Clinton); Harvey Berkman, *Congress' Reach May Be Nipped*, Nat'l Law J., Nov. 21, 1994, at A6 (predicting, before *Lopez*, that the Violence Against Women Act would withstand Commerce Clause challenge because most of its provisions contained jurisdictional nexus requirements);

*Constitutional Law Conference Probes Impact of Supreme Court's 1994-95 Term* [hereinafter *Constitutional Conference*], 64 U.S.L.W., Oct. 24, 1995 (Judge Frank Easterbrook, one of the participants, opining that the chief requirement *Lopez* imposes is that of a jurisdictional nexus requirement; colleague Professor Jesse Choper concurred). For cases employing the jurisdictional nexus requirement rationale, see, e.g., *Bishop*, 66 F.3d at 585 (federal carjacking statute, 18 U.S.C. § 2119, constitutional partially because of presence of jurisdictional nexus requirement); *United States v. Hinton*, No. 95-5095, 1995 WL 623876, at *2 n. 2 (4th Cir. Oct. 25, 1995) (unpublished per curiam) (federal felon in possession of a firearm statute, 18 U.S.C. § 922(g)(1), constitutional because it includes a jurisdictional nexus requirement), *cert. denied*, —— U.S. ——, 116 S.Ct. 1026, 134 L.Ed.2d 104 (1996).

29. The court agrees with my analysis that congressional findings can serve as surrogates for missing jurisdictional nexus requirements. *See op.* at 1449–50 (noting that § 1955 lacks a jurisdictional nexus requirement, but holding that the statute is still saved by the presence of "reams of legislative historical information"). In light of this agreement, the court's disapproval of *Olin*, 927 F.Supp. 1502, *op.* at 1449, n. 11, for holding that Congress either must make findings or include a jurisdictional nexus requirement is puzzling. Because I do not dispute that § 1955 is a commercial statute, I must be diverging from the court either over whether the findings that Congress made in this case have a logical stopping point or in my conclusion that *Lopez* imposes such a requirement. I infer from the court's discussion of Congress's findings that the court does not believe that *Lopez* imposes a logical stopping point requirement on congressional findings, despite the fact that the court acknowledges that *Lopez* carefully scrutinized the supporting rationales for the GFSZA offered by the Solicitor General. *Op.* at 1447–48.

have any logical stopping point. Just as a jurisdictional nexus requirement must put the regulation of some intrastate commercial activities off limits, so must the rationales offered to uphold the constitutionality of such a statute. I turn now to a consideration of these rationales.

### 3. Congress's Findings in Connection with § 1955

In *Lopez,* the Court rejected the following arguments to support the assertion that possession of a firearm within 1,000 feet of any school substantially affected interstate commerce: (1) firearm possession near schools could result in violent crime which, (a) has high costs that are paid by the general population through insurance premiums, and (b) could deter individuals from traveling to areas perceived to be unsafe; (2) firearm possession near schools substantially threatens the educational process, and therefore could reduce the productivity of the national citizenry. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1632. The Court labeled the first of these reasons, the "costs of crime" rationale, and

the second, the "national productivity" rationale. *Ibid.* Both of these rationales were flawed because under them "it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign." *Ibid.*[30]

In this case, Congress made supporting findings in the statute itself.[31] Normally, under my analysis of the *Lopez* substantial effects test, this would mean that I would not need to consider findings made in the legislative history or rationales offered to support the statute by the litigants, or attempt to attribute a purpose to the statute without these extrinsic aids. As these legislative findings show, however, the aim of § 1955 was to target organized crime's illegal gambling operations, though the law's actual ambit is vastly wider. If these congressional findings are to have any logical stopping points, those points must be contained in the five more particular findings set forth in the legislative history of § 1955 and addressed in detail below. The "reams" of rationales (see *op.* at 1450) mentioned in the legislative his-

---

**30.** To refute any potential objection that the logical stopping point analysis I present would never allow a congressional regulation to pass through the eye of its needle, I provide an example of a hypothetical statute I believe would be supported by findings *with* a logical stopping point. Consider a statute without a jurisdictional nexus requirement that regulated in some fashion all trade, interstate and intrastate, in radioactive waste, supported by congressional findings that (1) the problems sought to be remedied in connection with radioactive waste are relatively new because the artificial production of radioactive waste is relatively new; and (2) radioactive wastes stem largely from technologies enabled or created directly by the federal government during World War II's Manhattan Project. Neither of these two rationales is infinitely extendable or invasive of traditional areas of state regulation. The first, "newness" rationale obviously has limits that specifically invoke, and therefore respect, traditional state regulation. The second rationale, which relies on the federal government's unique role in having created the technologies that led to the proliferation of radioactive waste, also has a logical stopping point. Neither rationale would not allow Congress to regulate trade in all hazardous materials, let alone all human endeavors, unlike the "costs of crime" and "national productivity" rationales rejected in *Lopez.*

**31.** Congress's findings when it adopted § 1955 as part of a larger statute aimed at organized crime are discussed in *United States v. Aquino,*

336 F.Supp. 737, 739 (E.D.Mich.1972) (quoting Pub.L. 91–452, 84 Stat. 922 (1970), known as the "Organized Crime Control Act of 1970"):

> The Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; (3) this money and power are increasingly used to subvert and corrupt our democratic processes; (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens....

Only finding (2) mentions gambling in any way, and this finding relates solely to "syndicated gambling," not to the other forms of gambling that § 1955 reaches.

tory for enacting § 1955, however, have no logical stopping points:

> The Congress finds that (1) illegal gambling involves widespread use of, and has an effect upon, interstate commerce and the facilities thereof; (2) illegal gambling is dependent upon facilities of interstate commerce for such purposes as obtaining odds, making and accepting bets, and laying off bets; (3) money derived from or used in illegal gambling moves in interstate commerce or is handled through the facilities thereof; (4) paraphernalia for use in illegal gambling moves in interstate commerce; and (5) illegal gambling enterprises are facilitated by the corruption and bribery of State and local officials or employees responsible for the execution of or enforcement of criminal laws.

*Sacco,* 491 F.2d at 999 (quoting S.Rep. No. 617, 91st Cong., 1st Sess. 16 (1969)). I analyze each of these congressional rationales in turn to determine whether they can support the constitutionality of § 1955 in light of *Lopez.*

The first rationale, that any illegal gambling has an effect on interstate commerce, is marred in two respects. It references an effect, rather than a substantial effect, as *Lopez* requires. Moreover, even assuming Congress believed the effect to be substantial, this finding in the legislative history is not a rationale at all, merely an ultimate conclusion by Congress of what needs to be true in order for an exercise of its power to fall within the scope of the Commerce Clause. Congressional findings can be helpful to a court examining congressional intent, *Preseault v. ICC,* 494 U.S. 1, 17, 110 S.Ct. 914, 924–25, 108 L.Ed.2d 1 (1990), but they are not dispositive of the judicial inquiry required by the Commerce Clause. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631; *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 273, 85 S.Ct. 348, 366, 13 L.Ed.2d 258 (1964) (Black, J., concurring). The fifth rationale, relating to state and local corruption, while laudable and an excellent policy reason to justify federal intervention, does not even attempt to establish the necessary link between interstate commerce and the gambling activity being regulated. No causal chain linking state and local corruption and interstate commerce, however attenuated, was even stated in this rationale, let alone proven.

The third rationale is also devoid of any ability to limit Congress's power. If the fact that money derived from or used in an activity will travel in interstate commerce is sufficient to give Congress the power to regulate under the Commerce Clause, then this constitutional provision is rendered meaningless. In *Lopez,* the Court invoked a fear of congressional jurisdiction over family law, implicitly assuming that such regulation was beyond the Commerce power. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1632. Because the money used for child support payments and paid out as a result of divorce decrees is likely to move in interstate commerce, Congress's third rationale to support § 1955 would justify intrusion into the same area of state regulation that the Supreme Court argued in *Lopez* could not be reached.

The second (illegal gambling depends on facilities of interstate commerce) and fourth (illegal gambling uses paraphernalia that traveled interstate) rationales are closely related, and perhaps identical. They merit closer consideration. Dependence on the facilities of interstate commerce, the second rationale, is flawed because not every gambling enterprise requires information, such as centrally-established odds, to be transmitted across state lines. For instance, video poker gambling operations can be conducted without the transmission of odds information across state lines. Unlike a typical national sports betting operation, where a resident of New Jersey might call a bookie in New York to bet on a college football game taking place in California using odds set in Nevada, a video poker gambling operation need not necessarily use the facilities of interstate commerce—unless Congress intended "facilities" of interstate commerce to mean requiring the use of goods that have traveled in interstate commerce, in which case the identity of the second and fourth rationales becomes apparent.[32] *See* Lee, *18 U.S.C.*

---

32. Nevada is the only state with legalized sports betting. *See* Nev. Rev.Code Ann. § 463.160 (li-

*§ 1955: Who Conducts an Illegal Gambling Business?—It's Just a Roll of the Dice,* 12 W. St. U.L.Rev. at 239–40 ("Due to the prevalence of sports betting, most gambling money is presently wagered through bookmaking operations.... [D]ue to the vast informational system needed to effectuate a profitable and efficient operation, bookmaking has been exclusively dominated by organized crime elements.").

By contrast, *United States v. Leon,* 534 F.2d 667 (6th Cir.1976), the pre-*Lopez* case in which the Sixth Circuit upheld the constitutionality of § 1955 on Commerce Clause grounds, presents a better case on its facts for the existence of a substantial nexus with interstate commerce than this case. The gambling enterprise there was at least a conventional bookmaking operation that made great use of the telephone network and probably involved out-of-state betting. *Id.* at 672 (discussing illegal bets placed on a St. Louis sports team, in an action brought in the Eastern District of Michigan).

It is frequently said in the Commerce Clause context that "when it is necessary in order to prevent an evil to make a law embrace more than the precise thing to be prevented, it [Congress] may do so." *West-*

*fall v. United States,* 274 U.S. 256, 259, 47 S.Ct. 629, 629, 71 L.Ed. 1036 (1927) (Holmes, J.). Simply because video poker is not as closely connected to interstate commerce as a national sports betting operation does not mean that Congress might not be able to prohibit video poker, if such a prohibition were necessary to the enforcement of the proscription against truly national gambling. This is nothing more than a special example of the operation of the Necessary and Proper Clause in the Commerce Clause context.[33]

The celebrated case of *Wickard,* the result of which is not questioned in *Lopez,* although it clearly reached well beyond the text of the Commerce Clause, has been given a new orientation by the Supreme Court. *See United States v. Denalli,* 73 F.3d 328, 330 (11th Cir.1996) (per curiam) (*Lopez* makes it clear that the *Wickard* lines of cases " 'may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectively obliterate the distinction between what is national and what is local' ") (quoting *United States v. Pappadopoulos,* 64 F.3d 522, 526–27 (9th Cir. 1995)); *Alaska v. Babbitt,* 72 F.3d 698, 707 (9th Cir.1995) (Hall, dissenting) (concluding

censing enterprises and individuals conducting sports pools). Entrepreneurs in Florida, however, have recently begun conducting sports betting on ships outside of Florida's territorial waters. *Briefly: Sports Betting Sets Sail: Las Vegas–Style Gambling is Legal on Ship Off Florida Coast,* L.A. Daily News, Jan. 1, 1995.

**33.** "Congress shall have Power ... To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18.

In *McCulloch v. Maryland,* the great Chief Justice Marshall said of the Necessary and Proper Clause: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819). As Professor Epstein points out, however, this phrase has been taken out of context in Marshall's jurisprudence—a point demonstrated by noting his statement that, "[i]n the last of the enumerated pow-

ers, that which grants, expressly, the means for carrying all others into execution, Congress is authorized 'to make laws which shall be necessary and proper' for the purpose. But this limitation on the means which may be used, is not extended to the powers which are conferred." *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 187, 6 L.Ed. 23 (1824). Epstein, 73 Va. L.Rev. at 1397–1400 ("The clause does not, however, authorize the creation of new and independent heads of power ... that obliterate the distinction between a federal and a national government."). The Necessary and Proper Clause grants new means, but does grant the power to reach additional ends. Thus, in this context, only the Commerce Clause itself could define permissible ends. The views of Justice Marshall and whether his enthusiastic construction of the Necessary and Proper Clause in *McCulloch* has been misinterpreted is a subject to which the Walls devote too many pages in their brief. Ultimately, *Lopez* is the touchstone for determining how far courts may return to an originalist understanding of the interaction of the Commerce Clause and the Necessary and Proper Clause, however. Hence, whether we have gone down the wrong track because of misinterpretations of *McCulloch* is rather beside the point at this stage of constitutional development.

that a statute giving subsistence fishing priority on public lands to navigable waters *within* those public lands was outside of Congress's commerce powers because "[i]t would be hard to argue that the priority of a handful of Alaskan natives over subsistence fishing in one river in Alaska would "substantially affect" interstate commerce")[34]; *United States v. Schroeder*, 912 F.Supp. 1240, 1242–43 (D.Ariz.1995) ("No longer will the *Wickard v. Filburn* rationale be good enough to allow Congress to regulate any area of an individual's life.") (footnote omitted); Epstein, *Constitutional Faith and the Commerce Clause*, 71 Notre Dame L.Rev. at 174–75 (after *Lopez*, *Wickard* "becomes a case in which price stabilization . . . is thought to be achievable *only by* regulating the amount of wheat available in the market") (emphasis added).[35] *See* also John W. Boyle, Note, 34 Duq. L.Rev. 187 (1995) (puzzled by how the *Lopez* majority used *Wickard* to support its conclusions).

In *Lopez*, the Court categorized *Wickard* as standing for the proposition that intrastate activity may be regulated if doing so is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1631. After *Lopez*, *Wickard* is a category two case, regulating intrastate activities that threaten the regulation of things in interstate commerce or instrumentalities of interstate commerce.[36] *Id.* at ——, 115 S.Ct. at 1630–31.[37] *Wickard* thus becomes an excellent example of the application of the Necessary and Proper Clause to Congress's commerce power. *Wickard* upheld the Agricultural Adjustment Act of 1938, regulating the sale of homegrown wheat. 317 U.S. at 128–29, 63 S.Ct. at 90–91. The Court reasoned that it was within Congress's power to regulate the price of wheat in interstate markets. To do so effec-

34. The majority in the case did not dispute Judge Hall's conclusions, but merely held that Congress had not chosen to exercise its Commerce Clause powers in enacting the statute, 16 U.S.C. §§ 3113–3114, instead relying on another enumerated power—the Property Clause, U.S. Const. art. IV, § 3, cl. 2. *Babbitt*, 72 F.3d at 703.

35. This "transformation" of *Wickard* is in reality a return to the case's original meaning. As Robert L. Stern, ardent New Dealer and proponent of *Wickard*, explained in a law review article predating and perhaps influencing that case:

The constitutional lawyer may yet ask one more question: "If the power to regulate commerce among the states be not limited to acts affecting movement across state lines, but includes all commercial transactions in one state which affect business in other states . . . [i]s there any commercial activity Congress cannot control? . . . . Although all business may be said to affect commerce in other states to a slight extent, some line must undoubtedly be drawn. . . . Coal miners' wages in one state affect the wages of miners elsewhere, since the coal which they produce is in competition. A state which by itself attempted to raise the wages of its miners would ruin its domestic coal industry. If wage regulation is to be had, it must be had on a national scale to be effective. Barbers in different states, on the other hand, do not compete. The fact that in a few instances persons living near a state border might be induced to cross the line to get a cheaper hair cut would not of itself justify federal control of barbers' wages. But the wages of barbers are just as important to the

national purchasing power as the wages of miners or railroad conductors. In times when there is little unemployment and wages are high, a court might find that such wages did not "directly" affect business in other states through their effect on purchasing power. A contrary result might easily be reached when commerce in all the states is seriously obstructed by a lack of purchasing power throughout the entire nation."
Robert L. Stern, *That Commerce Which Concerns More States Than One*, 47 Harv. L.Rev. 1335, 1363–65 (1934) (paragraph breaks indicated by ellipses). I submit that Stern's reasoning and *Wickard* itself is based on nothing more than the Necessary and Proper Clause.

36. As discussed above (see pages 1459–60 & n. 15), however, § 1955 can be justified only on a category three, "substantial effects" argument. Therefore, the court is not persuasive in citing *Perez* as holding that a *single instance* of an intrastate activity can be regulated as long as it is part a class of activities having a substantial effect on interstate commerce. *Op.* at 1450–51 n. 14 (citing *Lopez* at ——, 115 S.Ct. at 1630). *See infra* p. 1478 for a discussion of the scope of the *Perez* "class of activities" doctrine after *Lopez*.

37. Professor Epstein summarizes the old view of the significance of *Wickard* very nicely: "To say that Congress may regulate X because of its price effects upon goods in interstate commerce, or because of its effects upon the quantity of goods so shipped, is to say that Congress can regulate whatever it pleases. . . ." Epstein, 73 Va. L.Rev. at 1796 (footnote omitted).

tively, however, it was vital to be able to regulate wheat production and homegrown consumption in the aggregate, even though any single grower of wheat at home was unlikely to disrupt the government's regulation of interstate wheat prices singlehandedly.

*United States v. Wrightwood Dairy Co.,* 315 U.S. 110, 119, 62 S.Ct. 523, 526, 86 L.Ed. 726 (1942), a case discussed along with *Wickard* in *Lopez,* is similar—Congress can regulate the price of milk sold intrastate because of competition with milk sold interstate. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1628 ("the commerce power 'extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power' ") (quoting *Wrightwood,* 315 U.S. at 119, 62 S.Ct. at 526). The broad sweep of § 1955 cannot be justified under *Wickard* or *Wrightwood Dairy* as interpreted in *Lopez,* however. Regulating video poker is in no sense necessary to regulating national sports betting. Intrastate video poker does not interfere in a substantial way with the regulation of national sports betting. The activities both involve gambling, but their regulation is completely severable. To argue otherwise would convert Justice Holmes's statement in *Westfall* (see *supra* p. 1468) into: 'when one evil properly within Congress's power is of the same general sort as another evil, then

Congress may regulate the other evil.' This is a tremendous distortion of the Necessary and Proper Clause and an improper expansion of Congress's power after *Lopez,* cutting against the grain of the entire purpose of enumerating specific congressional powers in the Constitution.[38]

The statutes involved in *Wickard* and *Wrightwood Dairy* are distinguishable from § 1955 because they involved price regulation. To regulate interstate prices effectively, it will almost always be necessary for Congress to regulate intrastate prices in the same good or service. Section 1955 is not aimed at regulating the price at which gambling activities take place. It is aimed at *eliminating* certain kinds of gambling activity, based on the legal status of those activities under state law, not on general commercial, or even moral, effects. The kinds of gambling activities that remain legal under § 1955 and those that it makes illegal were not thought by Congress to be fungible entertainments.[39] Certainly, in the aggregate, making some kinds of activities illegal will raise the price of the illegal activities and induce substitution toward legal forms of the activity. However, this is not the purpose of § 1955, as the findings of Congress make clear. Section 1955 is not a price regulation statute. If it were, the statute would define

---

**38.** There are two cases giving useful examples of regulations that can be justified under *Wickard* as reinterpreted in *Lopez. See Kelley v. United States,* 69 F.3d 1503, 1507–08 (10th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1566, 134 L.Ed.2d 665 (1996), where the Tenth Circuit upheld § 601 of the FAA Authorization Act of 1994, Pub.L. No. 103–305, 108 Stat. 1605 (1994), against a *Lopez*-based challenge. This Act preempted state economic regulation of intrastate motor carriers because the regulation of intrastate motor carriers was inextricably connected to the regulation of interstate motor carriers. For instance, some states' regulations were onerous enough to increase the prices for intrastate shipments to such a degree that some motor carriers would choose to ship a package across state lines and back again to take advantage of interstate transportation rates. *Kelley* is thus similar to *Wickard* and *Wrightwood Dairy* viewed through the prism of *Lopez.* It involves a species of price regulation. *Mother Waddles Perpetual Mission, Inc. v. Frazier,* 904 F.Supp. 603 (E.D.Mich.1995), is another example. In that case, the court found the jurisdictional nexus requirement in the Lanham Act, 15 U.S.C.

§ 1125(a), was met because, even though the defendant in the case had used the plaintiff's trademark in its home state, the plaintiff relied on its trademark in interstate commerce. *Id.* at 611. Moreover, the court noted that the trademark was used in connection with the sale of automobiles that could compete in price with cars sold in interstate commerce because even cars sold intrastate could be driven out of state and resold. *Ibid.*

**39.** If Congress did think that activities like the Walls' video poker operation and a live poker game at a legal casino in Las Vegas were fungible, then § 1955 makes even less sense, for in that case the statute simply encourages gambling activities to move to states where those activities are legal. Section 1955 effectively stifles competition to legal gambling from home-grown illegal gambling. Seen in this way, the federal government is, of course, actually aiding organized crime-infiltrated gambling operations in states with legalized gambling by crushing intrastate competition to shady operations with a legitimate cover.

the gambling activities made illegal without reference to state law. Any argument that Congress was attempting to regulate the price of interstate gambling by means of § 1955 cannot account for why Congress would therefore choose to exempt from federal reach all gambling that is legal under state law. The court admits as much in a footnote. *Op.* at 1451 n. 16. Legal gambling, like illegal gambling, may have the same effect of inducing people to cross state lines, yet it is not prohibited by the statute. Thus, the congressional aim in § 1955 was not to regulate the price of interstate gambling, but rather to add an additional level of federal, police-power-like, enforcement on top of existing state anti-gambling laws.

Congress's fourth rationale, resting on the fact that some illegal gambling paraphernalia travels in interstate commerce, cannot constitutionally justify § 1955 because the mere use of goods that have traveled in interstate commerce to further some activity should not be sufficient to establish that the activity has a substantial effect on interstate commerce. If this were not true, nearly every human activity could be regulated by Congress, as most contemporary activities involve the use of goods that are manufactured and transported across state lines or incorporate components that similarly traveled in interstate commerce. The Commerce Clause would thus be converted into a general police power. *Willamette Iron Bridge Co. v. Hatch*, 125 U.S. 1, 13, 8 S.Ct. 811, 817, 31 L.Ed. 629 (1888) (Congress lacks a general police power). Such an expansive reading of the Commerce Clause would violate the clear function of the enumeration of powers. *Lopez*, —— U.S. at ——, 115 S.Ct. at 1626. "To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce

Clause to a general police power of the sort retained by the States." *Id.* at ——, 115 S.Ct. at 1634. As the Supreme Court implicitly makes clear in *Lopez*, for instance, a federal domestic relations law is not authorized by the Commerce Clause simply because marital beds are purchased in interstate commerce.

There is every reason to give Congress more leeway in terms of regulating commercial activities than non-commercial activities. Activities like gambling at least involve commerce on some level. However, this recognition cannot be taken too far without judicially excising the word "interstate" from the Commerce Clause. The regulation of truly interstate gambling operations, such as those that make frequent use of the telecommunications network and rely on bettors living in different states, are within Congress's commerce power. A video poker operation that drew a substantial number of its patrons from other states also could be reached by Congress. Congress could have written a statute to reach these gambling operations alone simply by including a jurisdictional nexus requirement. Courts would then be free to judge the nexus with interstate commerce of the Walls' illegal gambling operation against such a provision—as, for example, the Supreme Court did for the RICO statute at issue in *United States v. Robertson*, —— U.S. ——, 115 S.Ct. 1732, 131 L.Ed.2d 714 (1995) (per curiam), a case decided shortly after *Lopez*. This statute included an interstate jurisdictional nexus requirement and thus permitted the Court to analyze the facts of the case to see if a sufficient statutory nexus existed.[40] By contrast, in § 1955, Congress did not use the caution it should have used in defining the interstate problem it was attempting to solve. The federal courts must guard against congressional overreaching and overbroad statutes, even if these abuses

---

**40.** Even if a jurisdictional nexus requirement existed in this case, I am not sure after *Lopez* that the Walls' operation would meet it. It is true that in *Robertson* the defendant's gold mine used goods and supplies purchased in interstate commerce, but the key difference between that operation and the Walls' operation is that the operation in *Robertson* was *directed* at interstate commerce. It sold the products of the mine in interstate commerce. There is no evidence in

the record that any of the users of the Walls video poker machines were from outside Tennessee or that the Walls advertised outside Tennessee to attract gamblers, for instance. *Compare Robertson with United States v. Pinckney*, 85 F.3d 4, 7 (2d Cir.1996) (holding that government had failed to prove that defendant had disposed of vehicles or parts in interstate commerce, as required by 18 U.S.C. § 2322).

result from congressional inadvertence. *See Sacco,* 491 F.2d at 1007–11 (Ely, J., dissenting) (laying out in detail the divergence between Congress's narrow desire to address the problem of organized crime in § 1955 and the very broad statute it actually enacted); John S. Baker, *Nationalizing Criminal Law: Does Organized Crime Make it Necessary or Proper?,* 16 Rutgers L.J. 495, 497 (1985) ("Activity labeled 'organized crime' has become almost indistinguishable from ordinary crime and even from some organized noncriminal activity. As a result, the role of federal law enforcement has expanded much more so than many realize.").

The Ninth Circuit, in *Pappadopoulos,* 64 F.3d 522, has reached this same conclusion: the mere use of "interstate commerce" goods in connection with some activity cannot be enough to grant Congress the power to regulate the activity on that basis alone. In *Pappadopoulos,* the Ninth Circuit held that the interstate commerce jurisdictional requirement (invoking Congress's full panoply of powers under the Commerce Clause [41]) of 18 U.S.C. § 844(i), prohibiting arson against buildings used in interstate commerce or in any activity substantially affecting interstate commerce, was not met when the defendant burned down a house that used natural gas purchased from a company that sometimes obtained that gas from other states. *Id.* at 527. Holding that neither the first (channels of interstate commerce) nor second (instrumentalities of interstate commerce) bases of commerce power under *Lopez* applied, the Ninth Circuit applied the third category's requirement that the effect on interstate commerce must be substantial for Congress to properly invoke its power: "The arson of

such a structure has only a remote and indirect effect on interstate commerce." *Id.* at 528.[42] On the other hand, the Fourth Circuit held that a house receiving electricity from an interstate power grid had a sufficient effect on interstate commerce to satisfy the nexus requirement of the arson statute. *United States v. Moore,* 25 F.3d 1042, 1994 WL 251174 at *3 (4th Cir.1994) (unpublished per curiam), *cert. denied,* ——— U.S. ———, 115 S.Ct. 1838, 131 L.Ed.2d 756 (1995). Justice Scalia, however, would have granted the writ and remanded for reconsideration in light of *Lopez.* ——— U.S. at ———, 115 S.Ct. at 1838.

*Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (upholding the application of Title II of the 1964 Civil Rights Act to a restaurant that obtained a large portion of its food in interstate commerce), and to a lesser extent *Heart of Atlanta* (rejecting a similar challenge to Title II where the public accommodations industry was subjected to anti-discrimination regulation because the patrons of such establishments were often interstate travelers), may seem to hold that the mere use of goods that traveled in interstate commerce is sufficient to allow regulation of the underlying activity. However, each of the statutory provisions in those cases contained a jurisdictional provision requiring the government to demonstrate an individualized nexus to interstate commerce. The statute in *Lopez* lacked such an element, as does § 1955. *Cf. United States v. Robinson,* 62 F.3d 234, 236–37 (8th Cir.1995) (upholding constitutionality of federal carjacking statute because statute had the jurisdictional nexus requirement lacking in the GFSZA and because cars are commod-

---

**41.** The court attempts to distinguish *Pappadopoulos* on the basis that it was not a Commerce Clause case, but a statutory interpretation case. *Op.* at 1448 n. 8. However, the *Pappadopoulos* court took great pains to emphasize that under Supreme Court case law, statutory provisions with a jurisdictional nexus, such as § 844(i), are meant to invoke Congress's full Commerce Clause power. *Pappadopoulos,* 64 F.3d at 525 (citing *Russell,* 471 U.S. at 859, 105 S.Ct. at 2456) (in the arson statute the jurisdictional nexus requirement "expresses an intent by Congress to exercise its full power under the Commerce Clause"). Thus, activities falling outside of a jurisdictional nexus requirement will be uncon-

stitutional to regulate under the Commerce Clause.

**42.** As the court points out, our circuit has upheld an application of § 844(i) in *United States v. Sherlin,* 67 F.3d 1208, 1213 (6th Cir.1995), *cert. denied,* ——— U.S. ———, 116 S.Ct. 795, 133 L.Ed.2d 744 (1996). However, *Sherlin* is distinguishable. In *Pappadopoulos,* the only connection with interstate commerce in that case was the tenuous one of gas heat, whereas in *Sherlin,* the building set aflame was a dormitory building used at a college in the business of providing educational services and 86% of its students were from out-of-state.

ities that move in interstate commerce); *United States v. Oliver,* 60 F.3d 547, 550 (9th Cir.1995) (same); *United States v. Hanna,* 55 F.3d 1456, 1462 (9th Cir.1995) (upholding constitutionality of federal statute criminalizing possession of a firearm by a convicted felon because it included a jurisdictional nexus requirement); *Campbell,* 891 F.Supp. at 212 (same). The statute in *Heart of Atlanta* was limited to the regulation of public accommodations, the operations of which "affect commerce." *Heart of Atlanta,* 379 U.S. at 247, 85 S.Ct. at 352. The statute in *McClung* was limited to the regulation of restaurants that offered "to serve interstate travelers" or that derived "a substantial portion of the food" they served from commerce. *McClung,* 379 U.S. at 298, 85 S.Ct. at 381. After *Lopez,* therefore, the statutes in *Heart of Atlanta* and *McClung* are insulated from facial constitutional challenges because they regulate commercial activity and have jurisdictional nexus requirements embedded within them.

For statutes lacking a jurisdictional nexus requirement, however, the connection to interstate commerce generally must be more than slight. The connection of an individual instance of some overall activity can be slight only if the regulation of that activity in the aggregate is *necessary* to the regulation of what is clearly interstate commerce. The regulation of intrastate gambling illegal under state law is in no sense necessary to the regulation of interstate gambling. Section 1955 is not a price regulation of a fungible good or service. Any argument to the contrary is undercut by the statute's failure to criminalize identical gambling activities in different states depending on whether the activities are legal under state law.

Section 1955 regulates a commercial activity, but it does not contain a jurisdictional nexus requirement. Section 1955's congressional findings contain no logical stopping point that could serve as a surrogate for the missing jurisdictional nexus requirement. If this statute is constitutional on the basis of Congress's findings in this case, then Congress could, by making similar findings in other statutes, regulate every intrastate activity in the country, including, for example,

domestic relations. Moreover, § 1955 regulates criminal activity, the regulation of which has been the traditional province of the states. Moralistically-based legislation outlawing gambling has also been the traditional concern of the states. Thus, § 1955 raises Tenth Amendment concerns that only reinforce my conclusion that this statute is unconstitutional.

I conclude § 1955 is unconstitutional under *Lopez*'s third category because some of the activity the statute regulates does not substantially affect interstate commerce.

## III. THE COURT'S ANALYSIS OF THE WALLS' COMMERCE CLAUSE CHALLENGE TO § 1955

As I read the court's opinion, it rests on five propositions: (1) § 1955, unlike the GFSZA in *Lopez,* is "commercially related ... part of an economic enterprise," *op.* at 1449; (2) the lack of a jurisdictional interstate nexus requirement, one of the defects of the GFSZA, is not fatal to § 1955's constitutionality, because unlike the GFSZA, § 1955 is supported by "reams of legislative historical information," *op.* at 1450; (3) *Perez,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686, which upholds the constitutionality of Title II of the Consumer Credit Protection Act (targeting loan sharking), 18 U.S.C. § 891 *et seq.,* is cited approvingly in *Lopez, op.* at 1451; (4) because § 1955 criminalizes only gambling that violates state law it shows Congress "display[ing] some sensitivity and respect for federal-state comity and avoid[ing] unwarranted intrusion in an area traditionally reserved to the states," *op.* at 1451 n. 16; and, (5) "Most courts have resisted urgings to extend *Lopez* beyond [the Gun Free School Zones Act (GFSZA), 18 U.S.C. § 922(q) ]," *op.* at 1448. Unfortunately, none of these rationales give *Lopez* its due.

### A. *Lopez* Allows Congress to Regulate Any Commercial Activity

First, it is a weak argument to maintain that the difference between running a gambling operation (undisputably a commercial enterprise) and possessing a gun within 1,000 feet of a school (probably not a commercial enterprise, unless one adopts the reasoning

of Justice Breyer's dissent in *Lopez,* in which case every human activity is a commercial enterprise) immediately makes *Lopez* inapposite to an inquiry into § 1955's constitutionality.[43] The court ignores portions of *Lopez* that are inconvenient to that argument. The Supreme Court indicated in *Lopez* that any rationale offered to support constitutionality under the substantial effects test will fail if it does not have a logical stopping point. *Lopez,* —— U.S. at —— – ——, 115 S.Ct. at 1632–33 (rejecting government's and Justice Breyer's proffered rationales because, if they were accepted, "it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign"). *See also Pappadopoulos,* 64 F.3d at 526, 528; *United States v. Wilson,* 880 F.Supp. 621, 625–26 (E.D.Wis.), *rev'd* 73 F.3d 675 (7th Cir.1995), *petition for cert. filed,* 64 U.S.L.W. 3669 (Mar. 20, 1996); Jeffrey Rosen, *Fed Up: Gun–Free School Zones Act of 1990 Justifiably Overturned by U.S. Supreme Court; Court Watch,* New Republic, May 22, 1995 (arguing Justice Breyer's dissent in *Lopez* is flawed because it presents no limits to federal power). *Cf. Northern Secs. Co. v. United States,* 193 U.S. 197, 402, 24 S.Ct. 436, 468, 48 L.Ed. 679 (1904) (Holmes, J., dissenting) ("Commerce depends upon population, but Congress could not, on that ground, undertake to regulate marriage and divorce.") The court's reasoning is tantamount to holding that Congress can regulate any commercial activity under the Commerce Clause. This argument ignores the sure stopping point given in the text of the Commerce Clause itself—the commercial activity must be "interstate" commercial activity. This is the purpose of *Lo-*

*pez*'s discussion of the lack of an interstate nexus requirement, given as a reason for striking down the GFSZA. In a pre-*Lopez* case, the Supreme Court even acknowledged this fact of Commerce Clause jurisprudence: "The subject of federal power is still 'commerce,' and *not all commerce* but commerce with foreign nations and among the several states. The expansion of enterprise has vastly increased the interests of interstate commerce, but the constitutional differentiation still obtains." *Wirtz,* 392 U.S. at 196, 88 S.Ct. at 2024 (quoting *Santa Cruz Fruit Packing Co. v. NLRB,* 303 U.S. 453, 466, 58 S.Ct. 656, 660, 82 L.Ed. 954 (1938)) (emphasis supplied). *See also* Linda Greenhouse, *Justices Step in as Federalism's Referee,* N.Y. Times, April 28, 1995, at A1 (quoting Justice O'Connor asking the Solicitor General at oral argument in *Lopez:* "Is there any *business enterprise* in America that wouldn't be covered" by your broad theory of the commerce power?).

The Walls conducted a wholly intrastate gambling operation in Tennessee. Their only connection with interstate commerce was their purchase of video poker machines from a Tennessee business that arranged to have the machines shipped from another business in New Jersey. This purchase was criminal under neither federal nor Tennessee law—only the Walls' use of the machines for gambling purposes transformed their acts into federal criminal behavior. Of course, if an isolated use, to further some activity, of goods that have traveled in interstate commerce is sufficient in and of itself to support federal regulation of that activity, then virtually no activity is immune from federal regulation.[44] Therefore, *Lopez* re-

---

**43.** Although again, the court is not without support. *See* Anne C. Dailey, *Federalism and Families,* 143 U. Pa. L.Rev. 1787, 1789 (1995) (arguing that it is misguided after *Lopez* to argue that family law occupies a sphere of exclusive state regulatory authority based on a distinction between commercial and noncommercial activity); Donald H. Regan, *How to Think about the Federal Commerce Power and Incidentally Rewrite United States v. Lopez,* 94 Mich. L.Rev. 554, 555 (1995) ("Justice Rehnquist's distinction between commercial and noncommercial activities that affect commerce is an unsupported and ill-considered gloss on an already misguided theory.").

**44.** *See also United States v. Grey,* 56 F.3d 1219, 1224–25 & n. 3 (Aldisert, J.) (10th Cir.1995) (citing *Lopez* for a related, but different point). *Grey* argues that the jurisdictional nexus requirement of the money laundering statute, 18 U.S.C. § 1956(c)—"affects interstate or foreign commerce" is phrased in the present tense and so requires contemporaneous or future effects on interstate commerce to be proven in order to prosecute someone successfully for violating the statute. On this basis, the *Grey* court rejected the government's argument that the transportation in interstate commerce of a video poker machine related to the money laundering offense

jects the reasoning that the Walls were engaged in interstate commerce merely by conducting a gambling operation that on one occasion used supplies lawfully purchased in interstate commerce.[45]

The court supports its argument that *Lopez* establishes that all regulation of commercial activity is constitutional by citing Judge Becker's dissent in *United States v. Bishop*, 66 F.3d 569 (3d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 681, 133 L.Ed.2d 529 (1995). *Op.* at 1450 n. 12. Judge Becker rejected the idea that 18 U.S.C. § 2119, which prohibits carjacking, was constitutional under the Commerce Clause because carjacking is not a commercial activity. Judge Becker argued in *Bishop* that an activity must involve a *voluntary* economic exchange in order to be deemed a commercial one. *Bishop*, 66 F.3d

at 591–92 (Becker, J., dissenting). Judge Becker's analysis, even if accepted, merely establishes that the existence of a commercial activity is a *necessary* requirement to sustain a use by Congress of its Commerce Clause powers to regulate activities that substantially affect interstate commerce after *Lopez*, not that the existence of a commercial activity is a *sufficient* requirement to that end.

### B. Existence of Congressional Findings in Regard to § 1955

Second, court attempts to circumvent the need for a jurisdictional nexus requirement in this case by pointing out that Congress made "reams" of findings in connection with § 1955. To be sure, the court is not alone in making this argument.[46] Nevertheless, the

---

*before* the money laundering offense occurred was sufficient to satisfy § 1956(c)'s jurisdictional nexus requirement. The defendant in *Grey* was also convicted for violating § 1955 for running a video poker operation similar to that of the Walls. If § 1955 were to have a jurisdictional nexus requirement, then the application of the same logic would also have called for the reversal of the defendant's conviction under this statute, as well.

**45.** *Robertson*, —— U.S. ——, 115 S.Ct. 1732, 131 L.Ed.2d 714, a RICO case decided just one week after *Lopez*, is not to the contrary. Construing the interstate commerce jurisdictional nexus requirement in the RICO statute, *Robertson* found that the requisite nexus was satisfied where the proceeds of illegal drug activities were invested in an Alaskan gold mine. The Court agreed with the government that the mine was "an enterprise which is engaged in, or the activities of which affect, interstate commerce." The defendant in the case purchased supplies for the mine in California and shipped those materials to Alaska. He hired employees outside Alaska to work in the mine. He also personally transported between 10–15% of the mine's product out of Alaska. Not surprisingly, this is an interstate business, in the same way that a national sports betting operation would be an interstate business. *See* Merritt, 94 Mich. L.Rev. at 732 ("*Robertson* was a far different case from *Lopez;* the disputed mine had multiple interstate contacts that formed an integral part of its operations. This was not a case in which the Court approved federal jurisdiction based on a single telephone call or a single case of supplies purchased from out-of-state."). Our case does not have the kind of multiple contacts to interstate commerce that were present in *Robertson*.

**46.** Charles J. Russo, *United States v. Lopez and the Demise of the Gun–Free School Zones Act:*

*Legislative Over-reaching or Judicial Nit–Picking?*, 99 Ed. Law Rep. 11 (1995) (it would be possible for the inclusion of findings in a revision of the Gun–Free School Zones Act to save that Act from unconstitutionality); Homan, *United States v. Lopez: The Supreme Court Guns Down the Commerce Clause*, 73 Denv. U.L.Rev. 237 (same); Robert C. Power, *The Fourth Revolution*, 52 Wash. & Lee L.Rev. 1699, 1712 n. 73 (1995) (reviewing William E. Leuchtenburg, The Supreme Court Reborn (1995)) (same); Michael Kirkland, *Court's 1994–95 Legacy May Be Transient*, UPI, July 7, 1995, *available in* LEXIS, Nexis Library, UPI File (Professor Laurence Tribe opines that the Court struck down the GFSZA because Congress was "careless" in not including any findings); David O. Stewart, *Back to the Commerce Clause*, 81 A.B.A. J. Jul., at 48 (suggesting findings could save GFSZA, but expressing some doubts about this conclusion); *Constitutional Conference* (Professor Jesse Choper arguing that the addition of congressional findings is one of two ways to make a statute constitutional after *Lopez* ). For cases employing the findings rationale, see, e.g, *Bramble*, 894 F.Supp. at 1395 (findings in regard to the enactment of federal drug statutes, 21 U.S.C. §§ 801(3), 801(4) and 801(6), make *Lopez* inapplicable to the question of the constitutionality of these statutes); *Gonzalez*, 893 F.Supp. at 937 (same argument in the context of 21 U.S.C. § 841); *Murillo*, 1995 WL 621797 at *2 (same argument in the context of 21 U.S.C. §§ 841(a), 843(b), 846). Most importantly, see *Torres*, 1995 WL 459247, at *2 (upholding the Hobbs Act, RICO, carjacking statute, 18 U.S.C. §§ 924(c), and 1959, against *Lopez*-based Commerce Clause challenges in a highly conclusory two-page opinion "because the legislative histories of the sections involved addressed concerns about interstate commerce.").

mere presence of congressional findings is not and cannot be dispositive of the issue of whether a statute is constitutional.[47] "*Lopez* is clearly a substantive, principle-based decision, and not a narrow procedural holding based on the lack of congressional findings." Gerald G. Ashdown, *Federalism, Federalization, and the Politics of Crime*, 98 W. Va. L.Rev. 789 (1996). "[T]he Court's major doctrinal basis for its holding had little to do with the presence or absence of findings." Philip P. Frickey, *The Fool on the Hill: Congressional Findings, Constitutional Adjudication, and United States v. Lopez*, 46 Case W. Res. L.Rev. 695 (1996). Obviously, if Congress can simply "find" that a statute is constitutional or simply "find" that a statute has the prerequisites for constitutionality, then the Commerce Clause, to say nothing of the rest of the written Constitution, is a rendered a dead letter. It is "emphatically the province and duty of the judicial depart-

ment to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803); *Heart of Atlanta*, 379 U.S. at 273, 85 S.Ct. at 366 (Black, J., concurring) ("whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court"). Moreover, a long line of precedent notes that Congress does not need to make findings in the Commerce Clause context, and that the courts have an independent duty to assess the rationality of any findings that Congress does make.[48] Granted, "deference" was the "buzz word" of pre-*Lopez* Commerce Clause decisions after the New Deal, but at no point does *Lopez* instruct the inferior federal courts to abdicate their responsibility to conduct judicial review in this context.[49] Quite

---

**47.** For an example of some truly amazing congressional findings, consider the following, made in connection with the subtitle of the Federal Agriculture Improvement and Reform Act of 1996 called the Popcorn Promotion, Research, and Consumer Information Act:

> Congress finds that—
> (1) popcorn is an important food that is a valuable part of the human diet;
> (2) the production and processing of popcorn plays a significant role in the economy of the United States . . .
> (3) popcorn must be of high quality, readily available, handled properly, and marketed efficiently to ensure that the benefits of popcorn are available to the people of the United States . . .
> [And, of course, no federal statute on popcorn would be complete without:]
> (6) popcorn moves in interstate and foreign commerce, and popcorn that does not move in those channels of commerce directly burdens or affects interstate commerce in popcorn.

Pub.L. 104–127, 110 Stat. 888, 1074 (1996). The Center for Science in the Public Interest may have a bone to pick with Congress about these findings. In fact, see *Popcorn Processors Want Promotion, Research Program*, Food & Drink Daily, Jan. 22, 1996, noting that this legislation directly resulted from slow popcorn sales in the wake of the negative publicity for movie theater popcorn created by the Center for Science in the Public Interest.

**48.** *United States v. Darby*, 312 U.S. 100, 118, 61 S.Ct. 451, 459, 85 L.Ed. 609 (1941) (findings not necessary); *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144, 68 S.Ct. 421, 424, 92 L.Ed. 596

(1948) (same); *McClung*, 379 U.S. at 299, 85 S.Ct. at 381 (1964) (same); *Perez*, 402 U.S. at 156, 91 S.Ct. at 1362 (1971) (same). *Cf. Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1025 n. 12, 112 S.Ct. 2886, 2898 n. 12, 120 L.Ed.2d 798 (1992) (Scalia, J.) ("In Justice BLACKMUN'S view . . . the test for required compensation is whether the legislature has recited a harm-preventing justification for its action. Since such a justification can be formulated in practically every case, this amounts to a test of whether the legislature has a stupid staff. We think the Takings Clause requires courts to do more than insist upon artful harm-preventing characterizations."); *Turner Broadcasting Sys., Inc. v. FCC*, — U.S. —, —, 114 S.Ct. 2445, 2471, 129 L.Ed.2d 497 (1994) ("the deference afforded to legislative findings [in the First Amendment context] 'does not foreclose our independent judgment of the facts bearing on the issue of constitutional law'") (quoting *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 129, 109 S.Ct. 2829, 2838, 106 L.Ed.2d 93 (1989)). *See also* Epstein, *Constitutional Faith and the Commerce Clause*, 71 Notre Dame L.Rev. at 177 (in *Lopez* Chief Justice Rehnquist says " 'we consider' legislative findings . . . . [h]e does not say that 'we' are bound by them"); *Prepared Testimony of John R. Carter before the Senate Judiciary Committee, available in* LEXIS, Nexis Library, July 11, 1995 (Lopez's counsel arguing that findings not enough to save legislation after *Lopez* ).

**49.** In fact, *Lopez* comments negatively on deferring to Congress: "Admittedly, some of our prior cases have taken long steps down that road [to converting the Commerce Clause to a general

to the contrary, *Lopez* notes only that courts should "consider legislative findings" "as part of [their] *independent* evaluation of constitutionality under the Commerce Clause." (Emphasis added). *Lopez* —— U.S. at ——, 115 S.Ct. at 1631. Indeed, the court shows its awareness of *Lopez*'s discussion of findings, but it quotes a selection from this discussion only for the proposition that Congress is not required to make findings in order for the constitutionality of a statute to be upheld. *Op.* at 1447 n. 5.[50] This is a mere tautology in light of the proposition that courts *independently* review the constitutionality of statutes—the existence of congressional findings does not put an end to the constitutional inquiry.

### C. *Lopez* Favorably Cites *Perez*

Third, the court's argument that *Lopez*'s favorable citation to *Perez* is significant is flawed. Before *Lopez* and under *Perez* alone, it is obvious that § 1955 would have been upheld as constitutional. This is indeed what our court did by citing and analyzing *Perez* in *Leon*, the pre-*Lopez* precedent in the Sixth Circuit upholding the constitutionality of § 1955.[51] It could be said that because the statute at issue in *Perez* was also directed at organized crime, § 1955 must survive if *Perez* has not explicitly been overruled by *Lopez*. But *Perez* involved a significantly different statute. The fact that some regulation is constitutional, of course, does not mean that all regulation is constitutional.

The Supreme Court's simple citation to *Perez* as an example of a statute previously held valid under a different view of the Commerce Clause is hardly an endorsement of anything more than the bare result in the case. The Supreme Court cited *Wickard* as well, yet it is obvious that some of the Justices on the Court have doubts about *Wickard*, at least as it had been interpreted before *Lopez*. *Id.* at ——, 115 S.Ct. at 1630 (*Wickard* is the most "far reaching example of Commerce Clause authority"). *See also id.* at ——, 115 S.Ct. at 1648 (Thomas, J., concurring) (attacking New Deal cases creating the substantial effect test). *Cf.* Raoul Berger, *Judicial Manipulation of the Commerce Clause*, 74 Tex. L.Rev. 695, 707–11 (1996) (applauding Justice Thomas for recognizing, as Thomas Jefferson[52] and James Madison did, that everything "affects" everything else, and that under a simple "affects" reading of the Commerce Clause, the enumeration of powers is threatened, if not eviscerated); Douglas A. Stevinson, Note, 26 Seton Hall L.Rev. 897 (1996) (criticizing the *Lopez* Court for not going far enough and leaving confusion about the validity of earlier Commerce Clause precedent in its wake). *But see Lopez*, —— U.S. at ——, 115 S.Ct. at 1637 (*Wickard* is among cases that are "within the fair ambit of the Court's practical conception of commercial regulation" that "are not called into question by our decision today") (Kennedy, J., concurring); *Bishop*, 66 F.3d at 590 (*Lopez* does not alter older precedent significantly); *Torres*, 1995 WL

---

[police power], giving great deference to congressional action.... The broad language in these opinions has suggested the possibility of additional expansion, but we decline here to proceed any further. To do so would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated ... and that there will never be a distinction between what is truly national and what is truly local...." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1634 (citations omitted).

**50.** *See* Berkman, *Congress' Reach May Be Nipped*, Nat'l Law J., at A6 (noting that at oral argument in *Lopez* Justice Scalia argued that the imposition of a findings requirement would itself violate the Constitution because the Court would be imposing an additional procedural requirement on the promulgation of legislation beyond those specified in the Constitution).

**51.** Before *Lopez*, the courts of appeals had uniformly upheld 18 U.S.C. § 1955. For a discussion of the cases in the other circuits, see Romualdo P. Eclavea, Annotation, *Validity, Construction, and Application of 18 USCS § 1955 Prohibiting Illegal Gambling Businesses*, 21 A.L.R. Fed. 708 § 3(a) (1974 & Supp.1995).

**52.** "Congress is authorized to defend the nation. Ships are necessary for defense; copper is necessary for ships; mines, necessary for copper; a company necessary to work the mines; and who can doubt this reasoning who has ever played at 'This is the House that Jack Built?' Under such a process of filiation of necessities, the sweeping clause makes clean work." Letter from Thomas Jefferson to Edward Livingston, (Apr. 30, 1800), *in* 7 *The Writings of Thomas Jefferson* 443, 444 (Paul Leicester Ford, ed., New York, G.P. Putnam's Sons 1896).

459247, at *2 (relying on pre-*Lopez* precedent to uphold constitutionality of RICO, the Hobbs Act, the federal carjacking statute, 18 U.S.C. §§ 924(c), and 1959).

I would agree with the court's conclusion if this case involved 18 U.S.C. § 891, the very statute at issue in *Perez*. In that situation, we could not apply *Lopez* to overrule *Perez*. Only the Supreme Court could do this. "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1921, 104 L.Ed.2d 526 (1989). *See also Hutto v. Davis*, 454 U.S. 370, 375, 102 S.Ct. 703, 706, 70 L.Ed.2d 556 (1982) (per curiam) (lower federal courts must follow Supreme Court precedent lest "anarchy ... prevail within the federal judicial system"); *Heath v. Varity Corp.*, 71 F.3d 256 (7th Cir.1995) (existing Supreme Court precedents directly on point must be applied by inferior federal courts, although such courts remain free to explain why they think that these precedents have been overtaken by subsequent developments in other Supreme Court precedent or are flawed in other respects); *United States v. Rawls*, 85 F.3d 240, 243 (5th Cir.1996) (upholding 18 U.S.C. § 922(g)(1) against Commerce Clause challenge after *Lopez* because of Supreme Court precedent upholding its predecessor statute, but noting that if the matter were being considered "res nova," a different result might have obtained). *Cf. Janklow v. Planned Parenthood, Sioux Falls Clinic,* —— U.S. ——, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996) (Scalia, J., dissenting from denial of certiorari) (criticizing Justice Stevens, concurring in the denial of certiorari, for arguing that courts of appeals could ignore a Supreme Court case based on doubts about that case's validity expressed by three Justices; arguing the courts of appeals must follow cases, not count votes). Section 1955, however, is both a statute that has never been determined to be constitutional by the Supreme Court and a statute that is very different than 18 U.S.C. § 891, the statute upheld in *Perez*.

Most importantly, the court's *Perez* argument, that Congress can regulate any intrastate activity when the class of activity to which it belongs substantially affects interstate commerce, is too broad. *Op.* at 1451 n. 14. *See also Chesney*, 86 F.3d at 570 (making the same error). The court's summary of *Perez*'s holding as interpreted in *Lopez* is true, but provides no support for upholding § 1955. In order for the regulation of intrastate instances of some activity to be regulable, their regulation must be necessary to the regulation of persons or things in interstate commerce. This is a key part of the holding in *Lopez*. Without it, all instances of an activity could be automatically conceptualized as a class which in the aggregate could be said to affect interstate commerce substantially and on that basis be regulated. Education in the aggregate affects interstate commerce. This was the point of the dissents in *Lopez*. So does marriage. After *Lopez*, however, in order to regulate education and marriage, for instance, Congress cannot simply assert that these classes of activity affect interstate commerce and on that basis regulate them. If this were the case, the Supreme Court would not have discussed the need for jurisdictional nexus requirements, which have the purpose of separating regulable instances of an activity from non-regulable instances of an activity. The Court would simply have concluded, as did the dissenters, that the possession of guns near schools, as a *class* of activities, affected interstate commerce. It is more than ironic that the court cites *Sacco*, 491 F.2d at 999, for the proposition: "If the class of activities is within the reach of the federal power ... [t]here is no need for inquiry on a case-by-case basis or proof that a particular activity had an effect on interstate commerce." *Op.* at 1451 n. 14. *Lopez* specifically points out that a jurisdictional nexus requirement serves exactly this purpose. —— U.S. at ——, 115 S.Ct. at 1631.

The *Perez* "class of activities" doctrine, like the prevailing interpretation of *Wickard*, has been reformulated in *Lopez*. First, the "class of activities" doctrine is never explicit-

ly discussed in the majority opinion in *Lopez*. Moreover, it is directly disparaged by Justice Thomas without comment by any of the other Justices in the majority. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1650 (Thomas, J., concurring). After *Lopez,* in order to regulate intrastate activities, it must be true such regulation is *necessary* to the regulation of some interstate activity. The court confuses the analysis applicable to *Lopez*'s second category with the analysis under the third, substantial effects, category, which is the only category relevant to this case. The Supreme Court noted only that a class of intrastate activities may be regulated when they *threaten* the regulation of the instrumentalities of interstate commerce or the regulation of persons or things in interstate commerce. *Id.* at ——, 115 S.Ct. at 1629. The discussion of a jurisdictional nexus requirement in category three analysis would be pointless if the *Perez*'s "class of activities" doctrine applied to this category. A jurisdictional nexus requirement's *raison d'etre* is to separate regulable instances of a class of activities out from non-regulable instances of a class of activities. If an entire class of activities could be regulated in category three, then a jurisdictional nexus requirement becomes superfluous.

### D. Section 1955 Is An Example of Congress Showing Comity to the States

Fourth, the court holds that § 1955 is constitutional because it criminalizes only gambling that violates state law, and so it shows "Congress display[ing] some sensitivity and respect for federal-state comity and avoid[ing] unwarranted intrusion in an area traditionally reserved to the states." *Op.* at 1451 n. 16. This last rationale is completely misguided, as the court itself seems to suspect. In *Lopez,* the federal government criminalized gun possession within 1,000 feet of a school. However, this was already a crime in some states. Indeed, the defendant in the case, Alfonso Lopez, was in state custody in Texas for committing a state felony, when agents from the federal Bureau of Alcohol, Tobacco, and Firearms took over and charged him with violating the GFSZA. Calve, *Anatomy of a Landmark.* Similarly,

§ 1955 criminalizes what is already criminal in the states. Moreover, it does so explicitly. Operation of the GFSZA did not depend on the existence of state law criminalizing the possession of a gun within 1,000 feet of a school, whereas § 1955 takes its cue directly from state law. Rather than minimizing unwarranted intrusion in an area traditionally reserved to the states, § 1955 intrudes *only* where the states have chosen to legislate, thereby maximizing intrusion. It is as if the Congress in § 1955 were saying to the states: "If this kind of gambling is important enough for your state to regulate in some fashion, under your control, then operations involving that same kind of gambling are so important that we, the federal government, can also regulate them in a wholly different fashion, under our control." Some comity!

By contrast with the congressional purpose behind § 1955, consider Congress's purpose in enacting the Interstate Wagering Amendment, at issue in the Third Circuit's *Pic–A–State Pa* case discussed above (see p. 1459 n. 12): "Federal laws should continue to limit the proliferation of interstate gambling to preserve the sovereignty of States that do not permit such forms of gambling." 76 F.3d at 1297 (quoting 139 Cong. Rec. S15247). The Interstate Wagering Amendment really does aid in protecting state sovereignty. It prohibited the interstate transmission of information about lottery tickets, protecting the integrity of a state's choice to prohibit gambling from being violated by other states' choices to the contrary. By contrast, criminalizing gambling on the federal level only when a state has chosen to do so does not protect the sovereignty of the states that have not chosen to criminalize that same kind of gambling in any way. And as pointed out above (see pp. 1470–71), § 1955 does not protect the states that have criminalized that gambling activity, either. It interferes with those states' policy choices. Contrary to the court's suggestion, then, § 1955 is not an example of Congress extending comity to the states.

By intruding upon criminal regulation, an area traditionally reserved to the states, § 1955 implicates the guarantees of the Tenth Amendment. *Lopez,* —— U.S. at ——,

115 S.Ct. at 1632 (states have "historically been sovereign" in criminal law enforcement).[53] The Tenth Amendment and federalism generally have been reinvigorated of late. *See, e.g., New York v. United States,* 505 U.S. 144, 165–67, 112 S.Ct. 2408, 2423, 120 L.Ed.2d 120 (1992) (holding that Congress can regulate interstate commerce directly under the Commerce Clause but cannot regulate state governments' regulation of interstate commerce); *Seminole Tribe of Fla. v. Florida,* —— U.S. ——, ——, 116 S.Ct. 1114, 1118, 134 L.Ed.2d 252 (1996) (overruling *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989) (plurality), which held that Congress could displace the states' Eleventh Amendment immunity by ·exercising its Commerce Clause powers, for "deviat[ing] sharply from [the] Court's established federalism jurisprudence"). *Cf.* Gary Lawson & Patricia · B. Granger, *The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause,* 43 Duke L.J. 267, 286–92 (1993) (calling for revivification of the Sweeping Clause's (another name for the Necessary and Proper Clause) requirement that the additional means granted to Congress for exercising its enumerated powers be "proper"). This development calls into question New Deal precedent that goes hand in hand with *Wickard. See, e.g., Darby,* 312 U.S. at 124, 61 S.Ct. at 462 (calling the Tenth Amendment a "truism" and nothing "more than declaratory"[54]); Anthony B. Ching, *Traveling Down the Unsteady Path: United States v. Lopez, New York v. United States, and the Tenth Amendment* 29 Loy. L.A. L.Rev. 99 (discussing the link between *New York v. United States* and *Lopez* ). The Tenth Amendment has long been interpreted as simply the reverse of the Commerce Clause. It has been thought to deny to Congress no power granted in Article I. If the Commerce Clause is interpreted so broadly that it imposes no limitations on congressional power, then nothing much has really been "reserved to the States, or to the people." Of course, even under this view of the Tenth Amendment, now that the Commerce Clause has been strengthened by *Lopez,* the Tenth Amendment resurfaces as a stronger limitation on federal power. The majority opinion and the concurring opinion by Judge Kennedy also hint, however, that the Tenth Amendment may be emerging as an *independent* check on congressional power. The Walls did not challenge § 1955 on Tenth Amendment grounds, so I did not address the question of whether § 1955 violates the Tenth Amendment. However, in light of *Lopez,* the presence of Tenth Amendment concerns further weakens the case to be made for § 1955's constitutionality under the Commerce Clause. *See United States v. Mallory,* 884 F.Supp. 496, 498–99 (S.D.Fla. 1995) (making a similar argument on the basis of the Fifth Circuit's *Lopez* decision).

It is also important to note that the federal courts have been deluged with cases of late. Part of the responsibility for this development has to be laid at the doorstep of the federalization of state crimes by Congress. Thus, *Lopez* 's directive to courts that statutes intruding upon the criminal law should be examined more intensively promotes not only state sovereignty, *Lopez,* —— U.S. at —— – —— & n. 3, 115 S.Ct. at 1631–32 & n. 3, but the quality of justice in the federal courts. *United States v. Crawford,* 982 F.2d 199, 205 (6th Cir.1993) (Merritt, C.J., concurring) ("Under the system of federalism devised by our founders and maintained until

**53.** Rosen, *Fed Up: Gun–Free School Zones Act of 1990 Justifiably Overturned by U.S. Supreme Court; Court Watch,* New Republic, (decrying the biannual congressional ritual "of making new federal crimes out of activities that are already criminal under state law"). For cases holding that one factor weighing in favor of striking down a statute is that it regulates an area traditionally left to the states, see, e.g., *Wilson,* 880 F.Supp. at 634 (FACE is unconstitutional partially because it intrudes on traditional state trespass laws); *Mussari,* 894 F.Supp. at 1363 (similar argument applied to the CSRA, 18 U.S.C. § 228,

based on traditional state regulation of family law).

**54.** Compare this with the statement in *New York* that only the *text* of the Tenth Amendment is a tautology. "The Tenth Amendment likewise restrains the power of Congress, but this limit is not derived from the text of the Tenth Amendment itself ... Instead, the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *New York,* 505 U.S. at 156–57, 112 S.Ct. at 2418.

recently, federal prosecutors have not sought to displace the state systems of criminal justice in routine cases. This is no longer the case as routine street crime cases ... are brought in federal court in order to insure longer sentences ... and mandatory minimum sentenc[es]"); Stephen R. McAllister, *Is There a Judicially Enforceable Limit to Congressional Power under the Commerce Clause?*, 44 U. Kan. L.Rev. 217 (1996) (arguing that reversing the trend of federalizing crimes is an important subtext in *Lopez* ).

### E. Other Courts Have Minimized *Lopez*

Finally, noting that most courts may have "resisted urgings" to extend *Lopez* may seem to imply that any attempt to breathe life into the Commerce Clause and the enumeration of powers generally, which even the court acknowledges is designed to prevent an absolute "aggrandizement" of power to the federal government, *op.* at 1446, should be thought of as some dark temptation. Moreover, a

close look at the now voluminous post-*Lopez* case law in the lower federal courts reveals that most of the statutes considered in those cases were plainly distinguishable from § 1955. Most significantly, cases addressing a challenge to a statute containing a jurisdictional nexus requirement or decided under the channels or instrumentalities headings, as opposed to the "substantial effect on interstate commerce" heading of the *Lopez* test are inapplicable to this case. This greatly reduces the significance of the court's "nose-counting" argument. The court also makes no effort to analyze thoroughly cases where *Lopez* challenges have succeeded or cases that drew a dissent. It merely footnotes some of those cases or mentions them in passing. *See, e.g., op.* at 1448–49 & n. 9.

The court's argument that most courts facing *Lopez*-based challenges to statutes have rejected them is also given illusory strength by the fact that the majority of these cases involve federal firearm regulation [55] (particu-

**55.** *Compare United States v. Abernathy*, 83 F.3d 17 (1st Cir.1996) (upholding 18 U.S.C. § 922(g)(1), (k)); *United States v. Bennett*, 75 F.3d 40 (1st Cir.1996) (upholding 18 U.S.C. § 922(g)(1)); *United States v. Diaz–Martinez*, 71 F.3d 946 (1st Cir.1995) (upholding 18 U.S.C. § 922(k)); *Frank v. United States*, 78 F.3d 815 (2d Cir.1996) (upholding 18 U.S.C. § 922(s)(2)); *United States v. Hernandez*, 85 F.3d 1023 (2d Cir.1996) (upholding 18 U.S.C. § 922(g)(1),(k)); *United States v. Sorrentino*, 72 F.3d 294 (2d Cir. 1995) (upholding 18 U.S.C. § 922(g)(1)); *United States v. Gateward*, 84 F.3d 670 (3d Cir.1996) (same); *Hinton*, 1995 WL 623876 (same); *Rawls*, 85 F.3d 240 (same); *United States v. Spires*, 79 F.3d 464 (5th Cir.1996) (same); *United States v. Kirk*, 70 F.3d 791 (5th Cir.), *petition for en banc rehearing granted*, 78 F.3d 160 (1996) (upholding 18 U.S.C. § 922(o)); *United States v. Turner*, 77 F.3d 887 (6th Cir.1996) (upholding 18 U.S.C. § 922(g)(1)); *Chesney*, 86 F.3d 564 (same, following *Turner* ); *United States v. Kenney*, 91 F.3d 884 (7th Cir.1996) (upholding 18 U.S.C. § 922(o)); *United States v. Bradford*, 78 F.3d 1216 (7th Cir.1996) (Coffey, J.) (upholding 18 U.S.C. § 922(g)(1)), *cert. denied*, —— U.S. ——, 116 S.Ct. 1581, —— L.Ed.2d —— (1996); *United States v. Lee*, 72 F.3d 55 (7th Cir.1995) (same); *United States v. Bell*, 70 F.3d 495 (7th Cir.1995) (same); *United States v. Bell*, 90 F.3d 318 (8th Cir.1996) (upholding 18 U.S.C. § 924(c)(1)); *United States v. Bates*, 77 F.3d 1101 (8th Cir. 1996) (upholding 18 U.S.C. § 922(g)(1)); *United States v. Monteleone*, 77 F.3d 1086 (8th Cir.1996) (upholding 18 U.S.C. § 922(d)); *United States v. Miller*, 74 F.3d 159 (8th Cir.1996) (per curiam) (upholding 18 U.S.C. § 922(u)); *United States v.* *Brown*, 72 F.3d 96 (8th Cir.1995) (per curiam) (upholding 18 U.S.C. § 924(c)(1)), *cert. denied*, —— U.S. ——, 116 S.Ct. 2581, 135 L.Ed.2d 1095 (1996); *United States v. Bolton*, 68 F.3d 396 (10th Cir.1995) (upholding 18 U.S.C. §§ 922(g)(1), 924(c)), *cert. denied*, —— U.S. ——, 116 S.Ct. 966, 133 L.Ed.2d 887 (1996); *United States v. Shelton*, 66 F.3d 991 (8th Cir.1995) (per curiam) (upholding 18 U.S.C. § 922(g)(1)), *cert. denied*, —— U.S. ——, 116 S.Ct. 1364, 134 L.Ed.2d 530 (1996); *United States v. Rankin*, 64 F.3d 338 (8th Cir.1995) (per curiam) (same), *cert. denied*, —— U.S. ——, 116 S.Ct. 577, 133 L.Ed.2d 500 (1995); *United States v. Mosby*, 60 F.3d 454 (8th Cir.1995) (same), *cert. denied*, —— U.S. ——, 116 S.Ct. 938, 133 L.Ed.2d 864 (1996); *United States v. Staples*, 85 F.3d 461 (9th Cir.1996), *amended* 1996 WL 359984 (upholding 18 U.S.C. § 924(c)); *United States v. Rambo*, 74 F.3d 948 (9th Cir.1996) (upholding 18 U.S.C. § 922(o)); *Mack v. United States*, 66 F.3d 1025 (9th Cir. 1995) (upholding 18 U.S.C. § 922(s)), *cert. granted sub nom. Printz v. United States*, —— U.S. ——, 116 S.Ct. 2521, 135 L.Ed.2d 1046 (1996); *United States v. Collins*, 61 F.3d 1379 (9th Cir. 1995) (upholding 18 U.S.C. § 922(g)(1)), *cert. denied*, —— U.S. ——, 116 S.Ct. 543, 133 L.Ed.2d 446; *Hanna*, 55 F.3d 1456 (same); *United States v. Nguyen*, 88 F.3d 812 (9th Cir.1996) (same); *United States v. Michael R.*, 90 F.3d 340 (9th Cir.1996) (upholding 18 U.S.C. § 922(x)(2)); *United States v. Snow*, 82 F.3d 935 (10th Cir. 1996) (upholding 18 U.S.C. § 922(u)); *Wilks*, 58 F.3d 1518 (upholding 18 U.S.C. § 922(o)); *United States v. McAllister*, 77 F.3d 387 (11th Cir. 1996) (upholding 18 U.S.C. § 922(g)(1)); *United States v. Deases*, 923 F.Supp. 170 (D.Kan.1996)

larly the ban on felons possessing firearms, 18 U.S.C. § 922(g)(1)) or narcotics regula-

(upholding 18 U.S.C. § 924(c)); *United States v. Campbell*, 891 F.Supp. 210 (M.D.Pa.1995) (upholding 18 U.S.C. § 922(g)(1)); *United States v. Cole*, Crim. No. 89–322, 1995 WL 375833 (E.D. Pa. June 16, 1995) (same); *United States v. Humphrey*, Crim. A. No. 95–348, 1995 WL 612837 (E.D.Pa. Oct. 16, 1995) (same); *United States v. Torres*, No. S2 94 CR. 466(JFK), 1995 WL 459247 (S.D.N.Y. Aug. 2, 1995) (upholding 18 U.S.C. § 924(c)); *United States v. Cash*, No. 95 CR 719, 1996 WL 332417 (N.D.Ill. May 31, 1996) (upholding 18 U.S.C. § 922(o)); *Wright v. United States*, Civ. A. No. 95–5733, 1996 WL 224672 (E.D.Pa. Apr. 29, 1996) (upholding 18 U.S.C.App. § 1202(a), predecessor statute to 18 U.S.C. § 922(g)(1)); *United States v. Latella*, No. 95 CR 474(LLS), 1996 WL 23148 (S.D.N.Y. Jan. 22, 1996) (upholding 18 U.S.C. § 922(g)(1)—following *Sorrentino* ); *United States v. Tripp*, No. 94 CR 0567, 1995 WL 417591 (N.D.Ill. July 13, 1995) (same); *United States v. Fryer*, 896 F.Supp. 763 (N.D.Ill.1995) (upholding 18 U.S.C. § 924(c)(1)); *United States v. Boone*, 904 F.Supp. 866 (N.D.Ind.1995) (upholding 18 U.S.C. § 924(m)) [hereinafter *Boone I* ]; *United States v. Boone*, 904 F.Supp. 868 (N.D.Ind.1995) (upholding 18 U.S.C. § 922(o)(1)) [hereinafter *Boone II* ]; *United States v. Snow*, 899 F.Supp. 1059 (W.D.N.Y.1995) (upholding 18 U.S.C. § 922(g)(1)); *United States v. Wesley*, 918 F.Supp. 81 (W.D.N.Y.1996) (same); *United States v. Walker*, 910 F.Supp. 837 (N.D.N.Y.1995) (upholding 18 U.S.C. § 924); *United States v. Chandler*, No. 95 CR 428, 1995 WL 683492 (N.D.Ill. Nov. 16, 1995) (upholding 18 U.S.C. § 922(g)(1)); *Bell v. United States*, 917 F.Supp. 681 (E.D.Mo.1996) (upholding 18 U.S.C. § 924(c)); *United States v. Cardoza*, 914 F.Supp. 683 (D.Mass.1996) (upholding 18 U.S.C. § 922(g)(1), (x)(1)(A) & (x)(2)(A)); *United States v. Bell*, 897 F.Supp. 1039 (M.D.Tenn.1995) (upholding 18 U.S.C. § 922(g)(1)); *United States v. McCord*, 904 F.Supp. 1029 (D.Neb.1995) (upholding 18 U.S.C. § 922(n)); *Medina*, 901 F.Supp. 59 (upholding 18 U.S.C. §§ 922(g)(1), 924(a)(2) & (c)(1)); *United States v. Bramble*, 894 F.Supp. 1384 (D.Haw.1995) (upholding 18 U.S.C. § 922(g)(1) & (g)(3)); *United States v. Edwards*, 894 F.Supp. 340 (E.D.Wis.1995) (upholding 18 U.S.C. § 922(g)(1)); *United States v. Hart*, 895 F.Supp. 189 (N.D.Ohio 1995) (same); *United States v. Giampa*, 904 F.Supp. 235 (D.N.J. 1995) (upholding 18 U.S.C. §§ 922(a)(4), 922(d)(1) & (2), 922(k), 26 U.S.C. § 5861(e)); *United States v. Williams*, 893 F.Supp. 617 (S.D.W.V.1995) (upholding 18 U.S.C. § 922(g)(1)); *United States v. Grafton*, Crim. No. 1:95–CR–131–FMH, 1995 WL 506001 (N.D.Ga. Aug.15, 1995) (upholding 18 U.S.C. § 924(c)); *United States v. Lynch*, 908 F.Supp. 284 (D.Vi. 1995) (same) *and United States v. Brown*, 893 F.Supp. 11 (M.D.N.C.1995) (upholding 18 U.S.C. § 922(g)(1)) *with Kirk*, 70 F.3d at 798 (Jones, J.,

tion [56]. Firearms statutes usually contains jurisdictional nexus requirements, unlike the

dissenting) (would have struck down 18 U.S.C. § 922(o)); *Mack*, 66 F.3d at 1034 (Fernandez, J., dissenting) (would have struck down 18 U.S.C. § 922(s)) *and United States v. Bownds*, 860 F.Supp. 336 (S.D.Miss.1994) (relying on the Fifth Circuit's *Lopez* decision would have struck down 18 U.S.C. § 922(o)). (In the string citation above some courts indicated only that they were addressing 18 U.S.C. § 922(g), rather than 18 U.S.C. § 922(g)(1). For consistency's sake above all of the former cases were also listed as 18 U.S.C. § 922(g)(1) cases.)

These cases provide little support for the court's upholding of 18 U.S.C. § 1955 in this case. First, the felon-in-possession statute, 18 U.S.C. § 922(g)(1), the source of the bulk of the firearms cases, has a jurisdictional nexus requirement, unlike § 1955. Second, *Deases, Cash, Kirk, Rambo* and *Boone I* were decided at least partially as channels cases. Third, *Mosby* and *Wilks* were at least partially decided as "things in interstate commerce" cases. Fourth, *Bolton, Brown, Walker, Torres, Fryer, Lynch,* and *Grafton* addressed 18 U.S.C. § 924(c). In order to violate § 924(c), one must have violated another federal statute. Section 924(c) could not possibly be unconstitutional.

**56.** *See United States v. Lerebours*, 87 F.3d 582 (1st Cir.1996) (upholding 21 U.S.C. §§ 841(a)(1), 846); *United States v. Genao*, 79 F.3d 1333 (2d Cir.1996) (upholding 21 U.S.C. §§ 841, 846); *United States v. Leshuk*, 65 F.3d 1105 (4th Cir. 1995) (21 U.S.C. § 841(a)(1)); *United States v. Clark*, 67 F.3d 1154 (5th Cir.1995) (upholding 21 U.S.C. § 860), *cert. denied,* —— U.S. ——, 116 S.Ct. 1432, 134 L.Ed.2d 554 (1996); *United States v. Tucker*, 90 F.3d 1135 (6th Cir.1996) (same); *Bell*, 90 F.3d 318 (upholding 21 U.S.C. § 841(a)(1)); *Brown*, 72 F.3d 96 (same); *United States v. Yoon*, No. 95–16698, 1996 WL 367621 (9th Cir. June 28, 1996) (unpublished per curiam) (upholding 21 U.S.C. § 841(a)(1)); *United States v. Wacker*, 72 F.3d 1453 (10th Cir.1995) (upholding 21 U.S.C. §§ 841(a)(1), 846); *United States v. Kremetis*, 903 F.Supp. 250 (D.N.H.1995) (same); *United States v. Smith*, 920 F.Supp. 245 (D.Me.1996) (upholding 21 U.S.C. § 841(a)(1)); *United States v. Salmiento*, 898 F.Supp. 45 (D.P.R.1995) (upholding 21 U.S.C. § 860); *United States v. Gonzalez*, 893 F.Supp. 935 (S.D.Cal. 1995) (upholding 21 U.S.C. § 841(a)(1)); *United States v. Garcia–Salazar*, 891 F.Supp. 568 (D.Kan.1995) (upholding 21 U.S.C. § 860); *United States v. Murillo*, No. CR 93–20131 JW, 1995 WL 621797 (N.D.Cal.1995) (upholding 21 U.S.C. §§ 841(a), 843(b), 846); *Smith*, 920 F.Supp. 245 (upholding 21 U.S.C. §§ 841(a)(1)-(2), 846), *Lynch*, 908 F.Supp. 284 (upholding 21 U.S.C. §§ 841(a)(1), 846, 952(a)); *Grafton*, 1995 WL 506001 (upholding 21 U.S.C. §§ 841, 846); *Walker*, 910 F.Supp. 837 (upholding 21 U.S.C.

statute involved in this case. And, generally speaking, the federal narcotics laws regulate an item in interstate commerce. Gambling, the activity regulated by § 1955, is a service. Three of the older federal statutes that have also seen a lot of post-*Lopez* challenges are the federal arson statute [57], the Hobbs Act [58], and the Travel Act.[59] All three of these statutes contain jurisdictional nexus requirements, unlike § 1955.

Three relatively new statutes that have been contested on Commerce Clause grounds are the federal carjacking statute [60], the Child Support Recovery Act of 1992

§§ 841, 846, 848); *Bramble*, 894 F.Supp. 1384 (upholding 21 U.S.C. §§ 841(a)(1), 844(a)).

**57.** No courts have struck down the federal arson statute, 18 U.S.C. § 844(i), as facially unconstitutional after *Lopez*. However, two circuits have found its jurisdictional nexus requirement, which is intended to invoke the full extent of Congress's commerce powers, not to be satisfied on the facts before them. *Compare United States v. Di-Santo*, 86 F.3d 1238 (1st Cir.1996) (finding jurisdictional nexus requirement of § 844(i) met after applying plain error review where commercial establishment was burned down that received natural gas and food supplied that had traveled in interstate commerce); *United States v. Gomez*, 87 F.3d 1093 (9th Cir.1996) (finding jurisdictional requirement of § 844(i) met where structure involved was a six-unit apartment complex presumed to be involved in interstate commerce); *Sherlin*, 67 F.3d 1208 (upholding § 844(i) and finding jurisdictional nexus requirement met where arson was committed at a college dormitory where 86% of the students came from out-of-state); *United States v. Martin*, 63 F.3d 1422 (7th Cir.1995) (upholding application of § 844(i) where arson was committed at a vacant rental property); *United States v. Flaherty*, 76 F.3d 967 (8th Cir.1996) (upholding application of § 844(i) where owner of burger and malt shop committed arson at his place of business in order to perpetrate insurance fraud); *Reedy v. United States*, 934 F.Supp. 184 (W.D.Va.1996) (finding jurisdictional nexus requirement met where structure burned down was a restaurant, potential buyers from another state had been sought, a small amount electricity was received from an electric company with a power grid extending across state lines, and the restaurant's owner had received a loan through the Federal Reserve System) *and United States v. Corona*, 934 F.Supp. 740 (E.D.La.1996) (upholding application of § 844(i) to a residential property being renovated for rental purposes as a youth hostel) *with Denalli*, 73 F.3d 328 (§ 844(i)'s jurisdictional nexus requirement not met where defendant burned down his neighbor's house, despite fact that neighbor sometimes brought home work, from a company that sometimes did interstate or international business, to do on his own computer) *and Pappadopoulos*, 64 F.3d 522 (§ 844(i)'s jurisdictional nexus requirement not met where residential property was burned down to collect insurance proceeds, but the residence's only connection to interstate commerce was the use of some out-of-state natural gas).

**58.** *See United States v. Millis*, No. 95–5474, 1996 WL 341181 (6th Cir. June 19, 1996) (unpublished per curiam) (upholding the Hobbs Act because it regulates commercial activity and has a jurisdictional nexus requirement; finding nexus requirement met where defendant robbed Subway Sandwich Shop located on an interstate highway); *United States v. Stillo*, 57 F.3d 553 (7th Cir.) (holding the Hobbs Act's jurisdictional nexus requirement satisfied on the facts of the case), *cert. denied*, —— U.S. ——, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995); *United States v. Farmer*, 73 F.3d 836 (8th Cir.1996) (same); *Bolton* (upholding the Hobbs Act against a facial challenge and finding its jurisdictional nexus requirement satisfied on the facts of the case); *United States v. Bruce*, 78 F.3d 1506 (10th Cir.1996) (same); *United States v. Arena*, 918 F.Supp. 561 (N.D.N.Y.1996) (upholding Hobbs Act against a facial challenge); *United States v. Arena*, 894 F.Supp. 580 (N.D.N.Y.1995) (same); *United States v. Wong*, No. CR–95–20075–RMW, 1996 WL 225007 (N.D.Cal. Apr. 29, 1996) (same); *Torres*, 1995 WL 459247 (same).

**59.** *United States v. Griffith*, 85 F.3d 284 (7th Cir.1996) (upholding Travel Act as applied to interstate prostitution business); *United States v. Baker*, 82 F.3d 273 (8th Cir.1996) (upholding Travel Act under first *Lopez* category—regulation of the instrumentalities of interstate commerce); *United States v. Goldberg*, 928 F.Supp. 89 (D.Mass.1996) (upholding Travel Act under first *Lopez* category and second *Lopez* category (regulation of persons or things in interstate commerce)).

**60.** *Compare Bishop*, 66 F.3d 569 (upholding the carjacking statute, 18 U.S.C. § 2119); *United States v. Coleman*, 78 F.3d 154 (5th Cir.1996) (same); *Robinson*, 62 F.3d 234 (same); *Oliver*, 60 F.3d 547; *United States v. Carolina*, 61 F.3d 917, 1995 WL 422862 (10th Cir.1995) (unpublished per curiam) (same); *United States v. Hutchinson*, 75 F.3d 626 (11th Cir.1996) (per curiam) (same—following *United States v. Williams*, 51 F.3d 1004, 1008–09 (11th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 258, 133 L.Ed.2d 182 (1995), but *Williams* does not mention *Lopez* even though it was decided after *Lopez* ); *United States v. Lowe*, 924 F.Supp. 318 (D.Mass.1996) (upholding carjacking statute); *Torres*, 1995 WL 459247 (same) *and United States v. Garcia–Beltran*, 890 F.Supp. 67 (D.P.R.1995) (same) *with Bishop*, 66 F.3d at 590 (Becker, J., dissenting) (would have struck down the carjacking statute.

("CSRA") [61], commonly known as the "Deadbeat Dads" legislation, and FACE [62]. Decisions relating to these statutes do not support the court's "nose-counting" argument because the outcomes of the cases addressing these statutes are more evenly balanced, with the exception of the carjacking statute, which has a jurisdictional nexus requirement. Dissenting opinions are also common in this area. Finally, there is a congeries of cases addressing the constitutionality of miscellaneous statutes.[63] None of these cases address § 1955.

**61.** *Compare United States v. Kegel,* 916 F.Supp. 1233 (M.D.Fla.1996) (upholding the CSRA); *United States v. Collins,* 921 F.Supp. 1028 (W.D.N.Y.1996) (same); *United States v. Sage,* 906 F.Supp. 84 (D.Conn.1995) (same); *United States v. Hopper,* 899 F.Supp. 389 (S.D.Ind.1995) (same); *United States v. Murphy,* 893 F.Supp. 614 (W.D.Va.1995) (same) *United States v. Hampshire,* 892 F.Supp. 1327 (D.Kan.1995) (same); *United States v. Ganaposki,* 930 F.Supp. 1076 (M.D.Pa.1996) (same) *and United States v. Nichols,* 928 F.Supp. 302 (S.D.N.Y.1996) (same) *with Mussari,* 912 F.Supp. 1248 (striking down the CSRA); *Schroeder,* 912 F.Supp. 1240 (same); *Parker,* 911 F.Supp. 830 (same) *and United States v. Bailey,* 902 F.Supp. 727 (W.D.Tex.1995) (same). Both *Mussari* and *Schroeder* had previous incarnations. These two opinions cited above involve rejecting government motions for reconsideration of the court's original decisions.

**62.** *Compare United States v. Wilson,* 73 F.3d 675 (7th Cir.1995) (upholding FACE), *petition for cert. filed,* 64 U.S.L.W. 3669 (Mar. 20, 1996); *United States v. Dinwiddie,* 76 F.3d 913 (8th Cir.1996) (same); *Cheffer,* 55 F.3d 1517 (same); *United States v. Scott,* 919 F.Supp. 76 (D.Conn. 1996) (same); *Lucero v. Trosch,* 904 F.Supp. 1336 (S.D.Ala.1995) (same); *Lucero,* 895 F.Supp. 1421 (same) *and United States v. White,* 893 F.Supp. 1423 (C.D.Cal.1995) (same) *with Wilson,* 73 F.3d at 689 (Coffey, J., dissenting) (would have struck down FACE); *Wilson,* 880 F.Supp. 621 (struck down FACE) *and Hoffman,* 923 F.Supp. 791 (struck down FACE).

**63.** *Compare Pic–A–State Pa.,* 76 F.3d 1294 (upholding 18 U.S.C. § 1301 criminalizing the interstate transportation of information about lottery tickets); *Flores v. City of Boerne,* 73 F.3d 1352 (upholding the Religious Freedom Restoration Act against a 10th Amendment challenge based on *Lopez* ); *United States v. Maloney,* 71 F.3d 645 (7th Cir.1995) (upholding RICO); *Griffith,* 85 F.3d 284 (upholding RICO, money laundering, and 18 U.S.C. § 371 (conspiracy)); *United States v. Folen,* 84 F.3d 1103 (8th Cir.1996) (upholding 18 U.S.C. § 842(i)(1), possession of explosives by a convicted felon); *United States v. Lomayaoma,* 86 F.3d 142 (9th Cir.1996) (upholding the Indian Major Crimes Act, 18 U.S.C. §§ 1153, 2244(a)(1)); *Cannon v. Group Health Serv. of Okla.,* 77 F.3d 1270 (10th Cir.1996) (upholding ERISA against a Tenth Amendment challenge based on *Lopez* ); *Kelley,* 69 F.3d 1503 (upholding the FAA Authorization Act of 1994); *Aroostook County Regional Ophthalmology Ctr. v. NLRB,* 81 F.3d 209 (D.C.Cir.1996) (upholding NLRB's jurisdiction under 29 U.S.C. § 158(a)(1), part of the National Labor Relations Act, over an employer); *Goetz,* 920 F.Supp. 1173 (D.Kan. 1996) (upholding the Beef Promotion and Research Act of 1985, 7 U.S.C. § 2901 *et seq.*); *Missouri v. United States,* 918 F.Supp. 1320 (E.D.Mo.1996) (upholding the Clean Air Act, 42 U.S.C. § 7401 *et seq.*); *In re Grand Jury Investigation of Targets,* 918 F.Supp. 1374 (S.D.Cal. 1996) (curious case upholding the propriety of a federal grand jury investigation of a state judge); *United States v. Trupin,* No. 95 Cr. 450, 1996 WL 50237 (S.D.N.Y. Feb. 8, 1996) (upholding 18 U.S.C. § 2315, criminalizing the receipt or "fencing" of stolen goods in interstate commerce); *Najarian,* 915 F.Supp. 1460 (upholding Food, Drug and Cosmetic Act); *Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n,* 914 F.Supp. 688 (D.Mass.1996) (upholding the Higher Education Act); *Abbott v. Bragdon,* 912 F.Supp. 580 (D.Me.1995) (upholding the ADA, 42 U.S.C. § 12182); *Mother Waddles Perpetual Mission,* 904 F.Supp. 603 (upholding the Lanham Act); *United States v. Cantor,* 897 F.Supp. 110 (S.D.N.Y.1995) (upholding 18 U.S.C. § 666, criminalizing the bribing of a state official working for an agency receiving federal benefits); *Fryer,* 896 F.Supp. 763 (upholding 18 U.S.C. § 2113, criminalizing bank robbery from Federal Reserve System members); *Bramble,* 894 F.Supp. 1384 (upholding various provisions of the Bald Eagle Protection Act and Migratory Bird Treaty Act); *Torres,* 1995 WL 459247 (upholding RICO and 18 U.S.C. § 1959, criminalizing violent crimes in aid of racketeering) *and Doe,* 929 F.Supp. 608 (upholding Violence Against Women Act of 1994, 42 U.S.C. § 13981) *with Pierce v. King,* 918 F.Supp. 932 (E.D.N.C. 1996) (holding that the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, could not be applied to cover employment by prisoners because such work would be outside Congress's commerce powers after *Lopez* ) *and Olin,* 927 F.Supp. 1502 (striking down the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*). *Cf. Pinckney,* 85 F.3d 4 (finding that jurisdictional nexus requirement not met on facts of the case); *Doe v. Norwest Bank Minn., N.A.,* 909 F.Supp. 668 (D.Minn.1995) (using *Lopez* to help decide whether the McCarran–Ferguson Act preempted RICO claims); *Murray v. R.E.A.C.H. of Jackson County, Inc.,* 908 F.Supp. 337 (W.D.N.C.1995) (Fair Labor Standards Act provisions should not be interpreted to apply to charitable organizations after *Lopez* ); *In re Bridget R.,* 41 Cal. App.4th 1483, 49 Cal.Rptr.2d 507 (1996) (using *Lopez* 's discussion of the Commerce Clause and

It must be emphasized that each statute should be considered on its own merits. There is no support for the court's rejecting a challenge to *this* statute based solely on the count of "early returns" from *Lopez* challenges to quite different statutes.[64]

## IV.

Each of the five rationales given by the court to support its holding that § 1955 is constitutional possesses some support, usually in pre-*Lopez* precedent. However, these rationales are now seriously flawed under the analysis used in *Lopez.* Section 1955 does not regulate conduct that "substantially affects" interstate commerce. Gambling is a commercial activity, but it is not necessarily an interstate commercial activity in all its manifestations. Under *Lopez*, a statute that is justified only by having a "substantial effect" on interstate commerce must either regulate a commercial activity under a rationale with a logical stopping point with reference to interstate commerce or have a jurisdictional nexus requirement through which courts can impose such a logical stopping point on a case-by-case basis. Section 1955 lacks such a jurisdictional nexus requirement. Congressional findings by their own force cannot substitute either for the lack of a logical stopping point or for a jurisdictional nexus requirement.

If the regulation of intrastate regulation were somehow necessary to the regulation of interstate gambling, in the way that the price of wheat sold in interstate markets was inextricably related to the consumption of home-grown wheat in *Wickard* or the way that the price of interstate milk was related to the price of intrastate milk in *Wrightwood Dairy,* § 1955 would be salvageable. However, the existence of interstate gambling does not depends on the existence of intra-

state gambling in the same way. Thus, especially in light of the fact that § 1955 intrudes in a peculiar and very targeted way into traditional areas of state authority, I must conclude that § 1955 is unconstitutional. With regret to Congress, and respect for the court's opinion, I would hold § 1955 unconstitutional because it is outside the scope of Congress's commerce powers. This is an area of the law now made treacherously uncertain by *Lopez,* but I think the court in this case is too quick to conclude that § 1955 should be upheld. One need only look to the Supreme Court's dormant Commerce Clause jurisprudence to see that non-toothless judicial review of cases arising under the Commerce Clause is possible. *See* Wille, 70 Tul. L.Rev. at 1091–95. *Lopez* should not be confined solely to its own facts. It is a significant milestone in constitutional law.

---

the Tenth Amendment to hold that the Indian Child Welfare Act would be unconstitutional if it were not limited to "existing Indian famil[ies]."); nexus requirement in 18 U.S.C. § 2322 (operating "chop shop").

**64.** The cases given in the preceding few footnotes summarizing the post-*Lopez* jurisprudence in the lower federal courts do not include every case

where *Lopez* was cited, only those cases where the *Lopez* issue was material to the outcome of the case or the case contained strong dicta suggesting the relevant court's view of the constitutionality of the statute at issue. Cases involving the GFSZA simply following the Supreme Court in *Lopez* were also excluded. Unpublished court of appeals cases were excluded unless they actually set precedent in the relevant court.